# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                    )
A LOVE OF FOOD I, LLC,              )
                                    )
                 Plaintiff,         )
                                    )
        v.                          )          **Civil Action No. 12-CV-1117(KBJ)**
                                    )
MAOZ VEGETARIAN USA, INC.,          )
                                    )
                 Defendant.         )
_____     )

## MEMORANDUM OPINION

In 2007, Plaintiff A Love of Food I, LLC ("ALOF" or "Plaintiff")—a corporate entity that David and Quinn Wallis established—entered into a franchise agreement with Defendant franchisor Maoz Vegetarian USA, Inc. ("Maoz" or "Defendant"). Under the agreement, ALOF was authorized to open a franchise of Maoz's vegetarian quick-service restaurant in the District of Columbia. ALOF did so, and has now brought the instant lawsuit against Maoz, contending that it lost over $900,000 when the franchise failed less than three years after opening. ALOF seeks rescission of the franchise agreement and also compensatory and punitive damages, specifically maintaining that it is entitled to this relief under the New York and Maryland state franchise laws because Maoz (1) failed to register its franchise offering statement with the relevant state authorities; (2) failed to provide that document to ALOF in a timely manner; (3) made statements projecting ALOF's future earnings, despite disclaiming the use of such statements; and (4) made untrue statements of material fact regarding initial start-up expenses. (Am. Compl. ¶ 38 (New York law violations); *id.* ¶ 30

(Maryland law violations).)  ALOF also maintains that Maoz's alleged underestimates
of the initial start-up expenses qualifies as fraud in the inducement under common law.
(*Id.* ¶¶ 39-49.)

Before this Court at present are the parties' cross-motions for summary
judgment.  (Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 41; Mot. for Summ. J.
("Pl.'s Mot."), ECF No. 43.)[1]  This Court has carefully considered the parties' evidence
and allegations regarding the complex series of state and common law claims made in
this case, and will **GRANT IN PART** and **DENY IN PART** both parties' cross-motions
for summary judgment, as explained in detail below.  The birds-eye view of the Court's
conclusions is that ALOF is entitled to judgment in its favor with respect to its failure-
to-register claims, but the Court concludes as a matter of law that nothing other than
nominal damages follows from this technical violation and that rescission of the
franchise agreement would not be appropriate on this basis.  The Court also finds that
ALOF is entitled to judgment under New York state franchise law for Maoz's violation
of the technical requirement that a franchisor disclose the offering prospectus in a
timely fashion, but again, no damages arose from this technical violation under the
circumstances presented here; moreover, because there is no cause of action for such a
disclosure violation under Maryland franchise law, ALOF's Maryland disclosure claim
must be dismissed.  Defendant Maoz is not without its own small victories: this Court
concludes that Maoz is entitled to have judgment entered in its favor with respect to
ALOF's claim that Maoz unlawfully represented that no statements regarding future
earnings had been made to ALOF when, in fact, Maoz had made such statements in the

---

[1] Page numbers throughout this opinion, except for deposition page numbers, refer to those that the
Court's electronic filing system assigns.

course of the franchise negotiations.  But the Court cannot grant summary judgment for either party on the statutory and common law misrepresentation claims that are premised on Maoz's allegedly false representations about start-up cost expenses, because there are genuine issues of fact regarding such material matters as whether Maoz knew its cost estimates were false, whether ALOF was entitled to rely on those estimates, and—with respect to the common law fraud claim only—whether Maoz intended to defraud ALOF.  What is left of ALOF's "kitchen-sink" complaint is ALOF's statutory and common law claims that are premised on alleged misrepresentations regarding the projected initial start-up expenses for the franchise (Am. Compl. Count I, ¶ 27, 30(d); Count II, ¶ 35, 38(d); Count III, ¶ 39-49)—claims that the parties must now either settle or prepare for trial.  *Cf. Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008) ("A kitchen-sink complaint, unless dismissed for some central jurisdictional or pleading flaw, is likely to be hard slogging, requiring that counts be worked through one by one.").

A separate order consistent with this opinion will follow.

## I.    BACKGROUND

ALOF is a Delaware-based limited liability company that was formed on May 25, 2007.  (ALOF Certificate of Formation, Ex. 2 to Def.'s Mot., at 2.)  David and Quinn Wallis—father and son—are the principals of ALOF.  (Am. Compl. ¶ 8.)  Maoz, a Delaware corporation formed in 2004, runs a network of quick-service vegetarian food restaurants within the United States.  (Maoz 2007 Uniform Franchise Offering Circular ("2007 Offering Prospectus"), Ex. 1 to Def.'s Mot., ECF No. 41-1, at 5; Yair Marinov Aff. in Supp. of Reargument or Reconsideration ("Marinov Aff."), Ex. 4 to

Def.'s Mot., ECF No. 41-4, ¶ 4.) This case arises out of ALOF's decision to enter into an agreement to open a Maoz franchise in Washington, D.C. ("the Agreement"), and in particular, the conversations and negotiations that occurred between the Wallises and Maoz's Vice President of Marketing and Sales, Yair Marinov, regarding that Agreement. (*See generally* Dep. of Yair Marinov ("Marinov Dep."), Ex. 3 to Def.'s Mot., ECF No. 41-3.) The Plaintiff and Defendant negotiated and entered into the Agreement against the backdrop of certain federal and state regulations that govern the sale and purchase of franchises; therefore, a basic understanding of the regulatory scheme in this area is crucial to full consideration of the claims being made in this case.

### A. The Federal Franchise Rule And The New York And Maryland Franchise Registration And Disclosure Laws

The Federal Trade Commission ("FTC") has promulgated regulations titled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures," 16 C.F.R. § 436 (2013) (commonly known as the "Franchise Rule" *see* John Bourdeau, *et al.*, 62B Am. Jur. 2d Private Franchise Contracts § 26 (2d ed. 2014)), which apply nationwide. Before selling a franchise, the Franchise Rule requires a franchisor to provide a prospective franchisee with a detailed disclosure statement—known as a "uniform franchise offering circular" or a "franchise disclosure document"—that includes information like the franchisor's corporate history and current financial condition, the track record of any other franchises, and the background of the franchisor's principal officers. *See* 16 C.F.R. §§ 436.5; *see also FTC v. Jordan Ashley, Inc.*, No. 93-2257-CIV, 1994 WL 200775, at *3 (S.D. Fla. Apr. 5, 1994); Bourdeau, *supra*, § 26. The disclosure requirements set forth in the Franchise Rule are "designed to protect prospective purchasers from the financial hardships that arise when

they purchase franchises and other business opportunity ventures without essential, reliable information about them." Bourdeau, *supra*, § 26. The FTC can bring suit to enjoin a franchisor's failure to furnish the required information in violation of the Franchise Rule, *see* 15 U.S.C. § 53(a); *see, e.g.*, *FTC v. Sage Seminars, Inc.*, No. 95-2854, 1995 WL 798938, at *1 (N.D. Cal. Nov. 2, 1995), but no private right of action is available to franchisees under these regulations. *See*, *e.g.*, *Layton v. AAMCO Transmissions, Inc.*, 717 F. Supp. 368, 371 (D. Md. 1989)*; Days Inn of America Franchising, Inc. v. Windham*, 699 F. Supp. 1581 (N.D. Ga.1988); *Freedman v. Meldy's, Inc.*, 587 F. Supp. 658 (E.D. Pa.1984); *Mon-Shore Mgmt, Inc. v. Family Media, Inc.*, 584 F. Supp. 186 (S.D.N.Y. 1984).

Along with this national regulatory scheme, a number of states have enacted similar laws, rules, or regulations governing franchise sales. *See* David J. Kaufmann, *Managing Legal Issues In Franchising: An Overview of the Business & Law of Franchising*, 2013 WL 3773409 (June 2013) (surveying the states). New York and Maryland are among the states with such rules. *See* N.Y. Gen. Bus. Law §§ 680-695 ("New York Franchise Sales Act"); Md. Code, Bus. Reg. §§ 14-201-14-233 ("Maryland Franchise Registration and Disclosure Law"). The purpose of these state laws is identical to the purpose of the Franchise Rule: both aim to protect franchisees. *See* N.Y. Gen. Bus. Law. § 680(2) (noting that the intent of the New York Franchise Sales Act is to "provid[e] prospective franchisees and potential franchise investors with material details of the franchise offering so that they may participate in the franchise system in a manner that may avoid detriment to the public interest" and to "prohibit the sale of franchises where such sale would lead to fraud or a likelihood that the

franchisor's promises would not be fulfilled"); Md. Code., Bus. Reg., § 14-202(b)

(noting that the intent of the Maryland Franchise Registration and Disclosure Law is to

"(1) give each prospective franchisee necessary information about any franchise offer;

(2) prohibit the sale of franchises if the sale would lead to fraud or a likelihood that the

franchisor's representations would not be fulfilled; and (3) protect the franchisor-

franchisee relationship").

To that end, both New York's and Maryland's franchise laws require a franchisor

to (a) register its offering prospectus with the relevant state authority before offering to

sell a franchise to any prospective franchisee, and also (b) disclose the offering

prospectus to any prospective franchisee in a timely fashion, *see* N.Y. Gen. Bus. Law §

683; Md. Code, Bus. Reg. § 14-223.   However, unlike the Franchise Rule, both state

franchise laws create a private right of action allowing individual franchisees to bring

suit against franchisors for violating certain procedural provisions and for making false

statements to a franchisee.  *See* N.Y. Gen. Bus. Law § 691(2); Md. Code, Bus. Reg., §

14-227.

## B.    Factual Background

As Plaintiff points out, "[o]ther than certain basic background facts, virtually all

of the facts" in this case are disputed.  (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.

J. & in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 43-1, at 8.)  The

events that either or both parties find material to the claims at issue in this case can be

summarized as follows.

1.    <u>Maoz's 2007 Offering Prospectus</u>

Initially based in Europe, Maoz Vegetarian USA was formed in 2004 "for the purpose of selling franchises and supporting franchisees" of its vegetarian restaurant in the United States (2007 Offering Prospectus at 5), but the company did not immediately begin the franchise process.  Instead, Maoz began its operations in the U.S. by opening its own restaurant locations:  its first company-run restaurant (referred to herein occasionally as a "store") opened in 2004 in Philadelphia, Pennsylvania, and it opened a second restaurant in New York City's Union Square in 2007.  (Marinov Dep. at 9-10; Marinov Aff. ¶ 5.)  Maoz did not begin the franchise registration process until December 28, 2006, when it applied to the California Department of Corporations for permission to offer and sell restaurant franchises in that state, a process known as "registration."  (Order Declaring Effectiveness of Cal. Registration, Pl.'s Ex. 4, ECF No. 43-6, at 2.)  Maoz's California registration was approved and became effective on March 7, 2007, when Maoz first registered its uniform franchise offering circular ("offering prospectus" or "UFOC") in California.  (*See id.*; *see also* Letter of California Dep't of Corps. ("Maoz Cal. Registration"), Ex. 33 to Def.'s Mot., ECF No. 41-33, at 2.)

Maoz's 2007 Offering Prospectus contained the various disclosures that the Franchise Rule requires.  (*See, e.g.*, 2007 Offering Prospectus at 5 (providing background information about "the franchisor, its predecessors and affiliates"); *id.* at 7 (the business experience of its directors); *id.* at 8-9 (required fees); *id.* at 10-14 (project start-up expenses).)  *See also* 16 C.F.R. § 436.5 (listing the disclosure requirements). Among the required disclosures was a document titled "Initial Investment" that

contained a list of "estimated initial expenditures" that a franchisee could expect to spend in order to establish a Maoz franchise. (2007 Offering Prospectus at 10-53.) For a start-up franchise, the total estimated start-up expenses listed in the prospectus ranged from $149,000 to $269,000. (*Id.* at 10; *see also id.* at 3.)[2] The estimates were based on a variety of assessments, including rent, utility deposits, leasehold improvements, and fees for such expenses as architects, equipment, and staff training. (*Id.* at 10.)

The 2007 Offering Prospectus also contained numerous disclaimers about each estimated dollar figure, as well as the total estimate. For example, with respect to rental costs, Maoz wrote that "[i]t is extremely difficult to estimate lease acquisition costs because of the wide variation between various locations." (*Id.* at 12 n.2.) Regarding improvements to the property, Maoz noted that "[t]he cost of leasehold improvements will vary based upon size, condition and location of the premises, local wage rates and material costs." (*Id.* at n.4.) As for certain other expenses, Maoz warned that it "cannot guarantee that [the stated] amount will be sufficient[,]" and that more money may be required in some situations. (*Id.* at 13-14 n.17.) Addressing the total estimate, Maoz reiterated that the "amounts shown are estimates only and may vary for many reasons, including the size of your Franchised Unit, the capabilities of your management team, where you locate your Franchised Unit and your business experience and acumen." (*Id.* at 14 n.18.)

Notably, the cost estimates that Maoz's 2007 Offering Prospectus provided were not based on the actual costs of other Maoz restaurant *franchises* in the United States,

---

[2] A "start-up franchise" is a franchise that is established as a Maoz restaurant in the first instance, as compared to a "conversion franchise," which is an option available to potential franchisors who "currently own and operate a food unit and wish to convert to [Maoz's] franchise System[.]" (2007 Offering Prospectus at 8.) The Wallises were interested in a start-up franchise.

because Maoz had yet to open any U.S. franchises at the time the 2007 Offering Prospectus was written. Instead, according to the prospectus, Maoz calculated the listed estimates by relying on the industry experience of its shareholders, who had "15 years of combined industry experience and experience in establishing and assisting [Maoz] franchisees in establishing and operating 23 MAOZ VEGETARIAN Units which are similar in nature to the Franchised Unit [a prospective franchisee] will operate." (*Id.*) As Marinov later explained, the twenty-three locations included the European franchises and the Philadelphia company-run restaurant location. (Marinov Dep. at 20 (noting that the information regarding estimated cost of opening a new franchised Maoz Vegetarian outlet "came from the Philadelphia store and from the European stores"); *id.* at 15 ("We had numbers in the [offering prospectus] based on what we have known about the European and Philadelphia store."); *id.* at 16 ("We have used in March the numbers that we had until then."); *id.* at 26 (noting that the initial start-up estimates were "based on everything that happened in Europe and in Philly").

Finally, the 2007 Offering Prospectus also disclaimed that the company was making any representations about what profits a franchisee could expect to make, noting that Maoz was neither "furnish[ing] nor authoriz[ing] [its] salespersons to furnish any oral or written information concerning the actual or potential sales, expenses or income of a MAOZ VEGETARIAN Unit. Actual results vary from unit to unit and we cannot estimate the results of any particular franchise." (2007 Offering Prospectus at 34.) In short, the information in Maoz's 2007 Offering Prospectus indicated that, when it came to U.S. franchises, the company was, in a sense, exploring new territory.

<u>Maoz Offers A Restaurant Franchise To Quinn Wallis</u>

Quinn Wallis met with representatives from Maoz's European counterpart, Maoz

B.V., in Europe in 2006,[3] and after returning to the U.S., Quinn Wallis reached out to

Marinov to discuss the possibility of opening a D.C. franchise.  (Marinov Dep. at 26-

28.)  At that time, Maoz had neither opened any U.S.-based franchises (*see* 2007

Offering Prospectus at 36), nor registered its Offering Prospectus in any state (*cf.* Maoz

Cal. Registration at 3 (filed December 28, 2006)).  Nevertheless, according to Marinov,

the Wallises "aggressively pursued Maoz for the purpose of seeking to obtain rights to

open a Maoz restaurant in Washington, D.C."  (Marinov Aff. ¶ 10.)  Marinov insists

that "[d]espite their eagerness," he repeatedly told the Wallises "that until the [Offering

Prospectus] was registered, we could not discuss the possibility of offering any rights to

open a Maoz location in Washington, D.C."  (Marinov Aff. ¶ 11.)  Marinov testified

that Maoz knew that the company could violate franchise disclosure laws if it discussed

franchise opportunities before the registration process was complete, and Marinov

maintains that he did not discuss franchise sales until the company had, in fact,

registered its Offering Prospectus.  (*See id.* ¶ 20 (noting that "[a]t the time of discussing

negotiating the UFOC and Franchise Agreement with ALOF, Maoz was at its very early

stages of development in the United States, and planned only [to] register[ ] its UFOC

in California and New York.  I was advised by counsel to avoid any discussions with

any prospective franchisees regarding the offer or sale of franchises in any territory that

---

[3] Maoz B.V. is a Netherlands-based company that owns and licenses franchises throughout Europe.
(*See* Def.'s Mot., Maoz's Summary of Undisputed Facts, ECF No. 41 at 10.)  Maoz B.V. is also a
shareholder in Defendant Maoz Vegetarian USA, Inc.  (*Id.* at 5, 10.)

required registration, where Maoz wasn't otherwise registered. I strictly followed my attorney's instructions.").)

The parties dispute when they first met to discuss the franchise. ALOF claims that the Wallises traveled to New York on September 18, 2006—six months prior to the registration of the 2007 Offering Prospectus in California—to meet with Marinov to discuss opening a D.C. franchise; both David and Quinn Wallis aver as much. (*See* Aff. of David Wallis ("D. Wallis Aff."), Ex. 1 to Pl.'s Mot., ECF No. 43-3, ¶ 2; Aff. of Quinn Wallis ("Q. Wallis Aff."), Ex. 3 to Pl.'s Mot., ECF No. 43-5, ¶ 2.) In support of this assertion, David Wallis has produced round-trip Amtrak ticket stubs from D.C. to New York dated September 18, 2006, and a receipt for lunch annotated with Marinov's name. (Amtrak Ticket Stub, Ex. 1 to D. Wallis Aff., ECF No. 43-3 at 4; Receipt, Ex. 2 to D. Wallis Aff., ECF No. 43-3 at 5.) There is no evidence in the record indicating that the Wallises requested a copy of Maoz's Offering Prospectus either before or during the alleged September meeting, and the parties agree that Maoz did not provide the Wallises with a copy on or before September 18, 2006. (Q. Wallis Aff. ¶¶ 2-4.)

In Defendant's briefing on the pending motions, Maoz denies that any meeting at all took place in September of 2006. (*See* Def.'s Opp'n to ALOF's Mot. for Summ. J. & Reply to ALOF's Opp'n to Maoz's Mot. for Summ. J. ("Def.'s Reply"), ECF No. 45, at 21 n. 18.) But at his deposition, Marinov stated that he did not remember whether he met with the Wallises that month or not:

> Q  Do you recall meeting with Quinn and David Wallis on September 18, 2006 in New York City?
> A  No.
> Q  Do you contend that that didn't happen?
> A  I don't remember.
> Q  You're denying that it happened?

A  I do not remember that I met them in September.
Q  So at this time, you can neither admit nor deny that you had that meeting in September?
A  That's what I don't remember.

(Marinov Dep. at 76-77.)  Moreover, the record contains emails between Quinn Wallis and Marinov planning for a meeting in September.  (*See* Summer 2006 Marinov Emails, Ex. 9 to Def.'s Mot., ECF No. 41-9, at 2-4 (Marinov writes in the email chain that the afternoon of September 18th would work best for him, and later confirms that "we are on for this coming Monday, September 18th at 4:30 PM in NYC").)

Although the September 2006 meeting is disputed, the parties do agree that Marinov met with the Wallises in New York on April 17, 2007.  (*See* Marinov Aff. ¶ 15; Marinov Dep. at 77; Q. Wallis Aff. ¶ 3.)  The Wallises testified that the purpose of the April 2007 meeting with Marinov was "to discuss the [D.C.] franchise opportunity" that they had been contemplating.  (Q. Wallis Aff. ¶ 3.)  Maoz concedes that the meeting occurred, but insists that the purpose of the meeting was *not* to discuss a D.C. franchise; rather, it was simply to show the Wallises the New York restaurant. (Marinov Aff. ¶ 15; *see also* Def.'s Mot. at 45 ("The sole purpose of the April 17, 2007" meeting was for the Wallises to "view the operations of the Maoz corporate store in Union Square in New York City").)

According to Maoz, on the same day of that April 2007 meeting, Marinov sent the 2007 Offering Prospectus—which by then had been registered in California—and a copy of the proposed Franchise Agreement by email to Quinn Wallis.  (Def.'s Mot. at 12; *see also* Marinov Dep. at 76 (Marinov testifies that he "e-mailed the [offering prospectus] back in April 2007").)  In addition, Marinov kept an "Activity Log"— that is, a contemporaneous record of communications with prospective franchisees— that

11

contains an entry indicating both that Quinn Wallis "got the [offering prospectus] – 4/17/2007" and that Marinov "was waiting to get the remarks from his lawyer about the franchise agreement." (Activity Log, Ex. 35 to Def.'s Mot., ECF No. 41-35, at 2.) However, neither party has produced an email from Marinov to Quinn Wallis reflecting actual delivery of the Offering Prospectus or draft franchise agreement in April of 2007, and indeed, Quinn Wallis denies that he received the documents on April 17, 2007—via email or otherwise—and avers that he received the Offering Prospectus for the first time by postal mail on June 6, 2007. (Q. Wallis Aff. ¶ 8-9.)[4]

According to an email dated June 6, 2007, Marinov sent "one copy" of an unspecified document to Quinn Wallis by mail. (*See* June 2007 Emails, Ex. 8 to Def.'s Mot., ECF No. 41-8, at 2.) The email does not provide further detail about the document that Marinov mailed, but ALOF contends that the "material" referenced in the email included the offering prospectus. (*See* ALOF's Statement of Undisputed Facts ¶ 7, Pl.'s Mot. at 11.) In contrast, Marinov testified that the word "material" actually referred to a "marketing folder" (Marinov Dep. at 78)—a representation that is corroborated in an email dated June 25, 2007, in which Marinov wrote that he was "mailing . . . today another marketing brochure" along with a New York Post review of Maoz's New York restaurant. (June 2007 Emails at 3.) Maoz explains that the marketing brochure referred to in the June emails is a photo-filled advertising packet,

---

[4] Although Marinov insists that he sent the documents to Quinn Wallis on April 17, he concedes that he "did not obtain a receipt from [Quinn Wallis] for the delivery" of any email. With respect to this omission, Marinov contends that Maoz simply lacks access to electronic copies of any such emails because the company subsequently transitioned into using a different email system. (Marinov Dep. at 84-85.)

not the Offering Prospectus. (Def.'s Mot. at 13; *see* Maoz Advertisement, Ex. 7 to Def.'s Mot., ECF No. 41-7, at 2-7.)

There is no dispute that the Wallises were in receipt of the 2007 Offering Prospectus and a copy of the potential Franchise Agreement as of June 2007 (whether Marinov had provided those materials in April or later), and at that time, the parties—assisted by counsel—entered franchise negotiations. (*See* June 28, 2007 Mem. from Bryan Brewer ("Brewer Mem."), Ex. 10 to Def.'s Mot., ECF No. 41-10, at 2.) During the course of these negotiations, Maoz specifically rejected ALOF's request to include an option to open a franchise in Maryland, noting that Maoz had "no current plans to file the [offering prospectus] in Virginia and Maryland" and no interest in opening franchises in either of those states for the time being. (Shelowitz Decl. in Supp. of Reargument or Reconsideration ("Shelowitz Decl."), Ex. 12 to Def.'s Mot., ECF No. 41-12, ¶¶ 15-16.) Furthermore, Marinov testified that he had understood throughout the franchise negotiations that the potential franchise was going to be in the District of Columbia, and he reported believing that the Wallises' business was also based there. (Marinov Aff. ¶¶ 11-14.) According to Marinov, Quinn Wallis "always spoke solely of launching the Maoz concept in Washington, D.C." and mentioned that he "was born and raised" and lived in Washington, D.C. (*Id.* ¶¶ 13, 16.) In a similar vein, Marinov reported that David Wallis also said that his business and family reputation were based in Washington, D.C. (*Id.* ¶ 14.)

Be that as it may, the Wallises officially formed ALOF as a Delaware limited liability company on May 25, 2007 (*see* ALOF Certificate of Formation, Ex. 2 to Def.'s Mot., ECF No. 41-2, at 3), and in an email in early June of 2007, Quinn Wallis

informed Marinov that his "mailing address for any material" regarding the franchise negotiations was an address in Chevy Chase, Maryland (*see* June 2007 Emails, at 2). Indeed, despite Marinov's professed understanding that the locus of the Wallises' business concern was in Washington, D.C., he mailed the aforementioned "materials" to Quinn Wallis at his Chevy Chase, Maryland address. (*See id*.).

3.    Execution Of The Franchise Agreement

The parties officially executed the Franchise Agreement on August 27, 2007. (*See* Franchise Agreement, Ex. 13 to Def.'s Mot., ECF No. 41-13, at 49-52.) The first paragraph of the agreement listed ALOF's principal address in Chevy Chase, Maryland. (*Id.* at 7.)[5] In addition to signing the agreement, Quinn Wallis signed a "Franchisee Disclosure Questionnaire," in which he acknowledged reviewing and understanding both the Franchise Agreement and the Offering Prospectus in full. (*See* Franchisee Disclosure Questionnaire, Ex. 27 to Def.'s Mot., ECF No. 41-27, at 2-5.) Quinn Wallis also certified that no "employee or other person speaking on [Maoz's] behalf made any statement or promise concerning the revenues, profits or operating costs of a MAOZ VEGETARIAN Unit that [Maoz] or [its] franchisees operate[,]" or any statements or promises contrary to the information in the Offering Prospectus or "concerning the likelihood of success that [ALOF] should or might expect to achieve" from operating a franchise. (*Id.* at 3.) Later that day, Quinn Wallis mailed the signed agreement from Chevy Chase, Maryland, to Marinov's New York office (*see* FedEx Airbill, Ex. 7 to

---

[5] The Wallises' home address was also listed in the Franchise Agreement, and it differed from ALOF's business address by one digit. (*See* Franchise Agreement at 51 (listing 3705 and 3707 as the home and business addresses' street number, respectively).)

Pl.'s Mem., ECF No. 43-9, at 2), and paid Maoz the $15,000 franchise fee (*see* Franchise Fee Check, Ex. 12 to Def.'s Mot., ECF No. 43-14, at 2.).

This D.C. franchise was Maoz's first restaurant franchise in the United States. (Aff. of Yair Marinov ("Marinov Aff. II"), Ex. 28 to Def.'s Mot., ECF No. 41-28, ¶ 5.) It is undisputed that on August 27, 2007, when the parties executed the Franchise Agreement, Maoz had not registered with the relevant authorities in the state of New York or in Maryland. And although Maoz had applied to register its Offering Prospectus in New York on June 6, 2007, its registration was not approved until September 4, 2007. (*See* Letter of N.Y. State Inv. Prot. Bureau, Franchise Section, Ex. 8 to Pl.'s Mot., ECF No. 43-10, at 2.)

### 4.    ALOF Takes Steps To Open Its Franchise

ALOF did not open its Maoz Vegetarian Restaurant franchise until November 2009—more than two years after executing the Franchise Agreement. (Marinov Dep. at 109.) The record suggests several reasons for this delay.

First, ALOF spent some of that time laying a foundation for the business. For example, in the fall of 2007, ALOF hired an accounting firm to project ALOF's earnings for the first five years of operation. (*See* ALOF Five Year Projected Financial Stmts., Ex. 26 to Def.'s Mot., ECF No. 41-26, at 4-16.) ALOF also actively sought additional investors. (*See* ALOF's Maoz Powerpoint, Ex. 25 to Def.'s Mot., ECF No. 41-25, at 14 (seeking investments); Private Placement Mem. ("PPM"), Ex. 37 to Def.'s Mot., ECF No. 41-37; Marinov Dep. at 109-110 (explaining that the Wallises were "raising money from other investors who would ultimately become members" of ALOF).) In a presentation to potential investors, ALOF anticipated build-out costs of

$375,000 for each franchise location—over $100,000 more than the estimate Maoz had provided in the 2007 Offering Prospectus. (Powerpoint at 13.) ALOF also identified the risks associated with the venture, noting that its "operations are subject to all of the risks inherent in the growth of a new business enterprise . . . including the uncertainties of market acceptance, competition, cost increases, inability to manage growth effectively and delays in achieving business objectives." (PPM at 19.)

It also took nearly a year for ALOF to find a retail space. ALOF ultimately decided on a basement-level unit in a townhouse (*see* Email from Architect, Ex. 14 to Def.'s Mot., ECF No. 41-14, at 3), a location about which Maoz expressed serious concerns (*see* Emails, Exs. 14-16 to Def.'s Mot., ECF Nos. 14-16.). But Maoz left "the final decision" of signing the lease to the Wallises, given their familiarity with the local market and their confidence about the franchise's success. (Email, Ex. 15 to Def.'s Mot., at 2.) ALOF signed the lease on October 31, 2008. (*See* Confirmation of Commencement of Lease, Ex. 22 to Def.'s Mot., ECF No. 41-22, at 2.)

During the period in which ALOF was searching for a location for its franchise, Maoz updated the cost estimates in its Offering Prospectus based on information gathered from the New York corporate store and ALOF's D.C. franchise. (Marinov Dep. at 46.) The 2008 Offering Prospectus reflected substantially higher costs than the 2007 Offering Prospectus, estimating a range between $282,000 to $494,500. (2008 Offering Prospectus, Ex. 24 to Def.'s Mot., ECF No. 41-24, at 3, 11.) According to Marinov, these increased costs were based, in part, on a change in design for the U.S. franchises, which involved more expensive materials and improved kitchen equipment.

(Marinov Dep. at 42-49.) Marinov also testified that these new numbers were based on information gathered after Maoz had opened other stores in the U.S.:

> [W]e took the numbers that we had from Philly and from the European stores. We did the New York store and later on, after we had, got the experience and we got more, we talked to people and we had more information about the costs in the U.S., we have updated the [Offering Prospectus] with the new costs.

(*Id.* at 45.) It is undisputed that Maoz never shared the 2008 Offering Prospectus with ALOF. (Q. Wallis Aff. ¶ 14; Marinov Dep. at 140.) [6] According to Quinn Wallis, if Maoz had shared the 2008 Offering Prospectus, ALOF would not have signed the lease and would not have moved forward with the franchise project. (*Id.* ¶ 15.)

But ALOF did sign the lease, and completing the build-out of the location proved more costly than the Wallises had imagined based on problems associated with the specific location ALOF had chosen, including the need to obtain a historic building permit and issues with the landlord. (*See, e.g.*, Emails Regarding Location Problems, Exs. 19-20 to Def.'s Mot., ECF Nos. 19-20.) In fact, ALOF ended up spending $637,203 in initial investments—approximately $360,000 more than the high end of the range estimated in the 2007 Offering Prospectus, and $140,000 more than the high end of the increased range reflected in the 2008 Offering Prospectus. (*See* Q. Wallis Aff. ¶ 21; 2007 UFOC at 3; 2008 UFOC at 3.)

ALOF's D.C. franchise restaurant finally opened in November of 2009 (*see* Def.'s Mot. at 9-10), but it closed after slightly more than two years of operation, in

---

[6] Indeed, the record is unclear regarding exactly when ALOF first became aware of the 2008 Offering Prospectus. Although Quinn Wallis contended in his affidavit that he saw it for the first time after the instant litigation began (Q. Wallis Aff. ¶ 15), ALOF must have seen a copy prior to filing the complaint, since the increased costs in the 2008 Offering Prospectus are referenced in the complaint. (*See* Am. Compl. ¶ 45.)

January of 2012. According to Quinn Wallis, ALOF sustained net operating losses of $271,633, bringing Plaintiff's total out-of-pocket expenditures on their venture to $908,836. (Q. Wallis Aff. ¶ 21.) The month after the franchise folded, ALOF registered as a foreign company doing business in the State of Maryland. (*See* Letter of State of Maryland Dep't of Assessments & Taxation, Ex. 9 to Pl.'s Mot., ECF No. 43-11, at 2 (ALOF filed an application to register on February 29, 2012, paying the $100 recording fee, the $50 expedited fee, and a $200 penalty).)

## C. Procedural History

### 1. ALOF Files Suit In The District Of Maryland

On August 25, 2010, ALOF filed the instant three-count complaint in federal court in the District of Maryland. (*See* Am. Compl., ECF No. 6.)[7] In Count I, ALOF alleges that Maoz violated the Maryland Franchise Registration and Disclosure Law, Md. Code, Bus. Reg. §§ 14-201-14-232, by failing to register its offering prospectus, failing to disclose its offering prospectus in a timely fashion, and making statements in the offering prospectus that misrepresented start-up costs and disclaimed any earnings statements. (*Id.* ¶¶ 22-30.) In Count II, ALOF alleges that Maoz violated the New York Franchise Sales Act, N.Y. Gen. Bus. L. § 680-685, for the very same reasons. (*Id.* ¶¶ 31-38.) ALOF seeks $900,000 in compensatory damages for these statutory violations. (*Id.* ¶¶ 30(b), 38(b).) In Count III, ALOF alleges that Maoz's start-up cost estimates and disclaimer of earnings statements constituted common law fraud. (*Id.* ¶¶

---

[7] Plaintiff initially brought suit against Maoz and also against individual defendants Yair Marinov and Boaz Schweitzer ("Individual Defendants"). (Am. Compl., ECF No. 6.) The Maryland federal court dismissed the Individual Defendants for insufficient service of process because ALOF did not serve them in a timely manner. (Mem. Op., ECF No. 26 at 11.)

39-49).  ALOF seeks the same $900,000 in compensatory damages as well as $1.8 million in punitive damages for these alleged violations.  (*Id.* ¶ 49).

After discovery, the parties filed cross-motions for summary judgment.  (Def.'s Mot.; Pl.'s Mot.)  The Maryland federal court held a hearing on the motions (*see* Minute Entry of Proceedings held on June 18, 2012, ECF No. 51), then, on June 28, 2012, granted in part Defendant's motion for summary judgment on the ground that the court lacked personal jurisdiction over Maoz given the lack of a "substantial connection" between Maoz and the state of Maryland.  *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 870 F. Supp. 2d 415, 425 (D. Md. 2012).  Because the court found it had no jurisdiction to assess the merits of the claims, it denied as moot the remainder of the parties' motions.  *Id.* at 426("[T]his ruling does not address the merits of ALOF's case, and all issues involving the merits may be re-raised by both parties in the transferee court.").  The court then transferred this case to the District of Columbia, where the parties had stipulated that personal jurisdiction over Maoz is proper.  *Id.*

## 2. Litigation Commences In The District Of Columbia

The matter was assigned to this Court in April of 2013.  (*See* Minute Entry of April 9, 2013.)  The parties renewed their cross-motions for summary judgment (Status Report, ECF No. 64, at 2), and this Court directed the parties to file supplemental briefing to update the case citations in their year-old motions and to provide any relevant D.C. law.  (Minute Order of June 10, 2013.)  Neither party provided additional authority.  (*See* Pl.'s Suppl. Mem., ECF No. 67; Def.'s Suppl. Mem., ECF No. 68.) This Court subsequently held a hearing on the cross-motions (Minute Order of August 16, 2013), and, at the conclusion of the hearing, took the motions under advisement.

## II.     LEGAL STANDARDS

### A.     Summary Judgment Standard

Federal Rule of Civil Procedure 56 makes clear that summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead decide only whether there is a genuine issue [of material fact] for trial." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks and citation omitted).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In determining whether there is a genuine dispute about a material fact, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *See, e.g.*, *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013); *see also Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  The moving party may successfully support its motion by identifying those portions of the record that it believes demonstrate the absence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(A).  The non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his position; rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S.

at 252. Further, the non-moving party "may not rest upon mere allegations or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks omitted).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1188 n.4 (D.C. Cir. 1989) (alteration in original) (citation omitted). "In assessing each party's motion, [a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *Vaughan v. Amtrak*, 892 F. Supp. 2d 84, 91-92 (D.D.C. 2012) (internal quotation marks and citation omitted)).

### B.      Heightened Standard For Fraud Claims

A heightened standard applies on summary judgment motions pertaining to fraud claims: in such cases, the plaintiff must present sufficient evidence to demonstrate a prima facie case of fraud by clear and convincing evidence. *See, e.g.*, *Hughes v. Abell*, 867 F. Supp. 2d 76, 92 (D.D.C. 2012); *Zirintusa v. Whitaker*, 674 F. Supp. 2d 1, 8 (D.D.C. 2009). Courts are hesitant to grant summary judgment in fraud cases, especially when fact issues turn on the defendant's testimony, because a jury is better-suited to making credibility determinations. *See Zirintusa*, 674 F. Supp. 2d at 8 (citing *ABB Daimler-Benz Transp. (N. Am.), Inc. v. Nat'l R.R. Passenger Corp.*, 14 F. Supp. 2d 75, 86 (D.D.C. 1998)). Courts are similarly hesitant to resolve at summary judgment issues of a party's motive or intent—such as intent to defraud; consequently, these

issues are generally reserved for trial. *See, e.g.*, *Weidel v. Ashcroft*, 234 F. Supp. 2d 5, 8 n.4 (D.D.C. 2002) (collecting cases).

## III. DISCUSSION

Plaintiff ALOF alleges that Defendant Maoz violated the Maryland and New York franchise statutes when it (1) failed to register its Offering Prospectus with the relevant state authorities; (2) failed to disclose the Offering Prospectus to ALOF in a timely manner; (3) disclaimed making any earnings statements in the Offering Prospectus; and (4) misrepresented initial start-up expenses in the Offering Prospectus. Plaintiff ALOF also alleges that Defendant Maoz committed common law fraud by knowingly providing false estimated start-up expenses in the offering prospectus. The Court will address the state franchise law claims first and then turn to the common law fraud claim.

### A. The Maryland And New York State Franchise Laws Apply

As a threshold matter, the parties dispute whether the Maryland and New York Franchise Sales Acts apply to their relationship. For the reasons discussed below, this Court concludes that they do.

#### 1. The Maryland Franchise Registration And Disclosure Law

By its text, the Maryland Franchise Registration and Disclosure Law ("MFRDL") applies whenever (i) the offeree or franchisee is a resident of Maryland; (ii) the franchised business will operate in Maryland; (iii) the offer to sell is made in Maryland; or (iv) the offer to buy is accepted in Maryland. Md. Code, Bus. Reg., § 14-203(a)(2)(i)-(iv). Maoz maintains that none of these jurisdictional hooks attaches to the relationship between Maoz and ALOF (Def.'s Mot. at 53-54), while ALOF argues that

the Wallises' residence in Maryland renders the MFRDL applicable under § 14-203(a)(2)(i) (*see* Pl.'s Mem. at 33).

A Maryland resident is an entity whose principal place of business is in the state. *See Joe Shifflett, Inc. v. Prop. & Cas. Ins. Guar. Corp.*, 551 A.2d 913, 914 n.1 (Ct. of Special App. Md. 1989) ("[A] corporation or entity [such as an LLC] whose principal place of business is in this State is a resident within the meaning of the Code." (citing Md. Ann. Code. Art. 48A § 505(h)(2) (1985))); *accord* 28 U.S.C. § 1332; *cf. Choice Hotels Int'l, Inc. v. Madison Three, Inc.*, 23 F. Supp. 2d 617, 620 (D. Md. 1998) (Franchisee, a Massachusetts corporation, was subject to personal jurisdiction in Maryland for purposes of franchisor's suit alleging breach of franchise agreement, where Maryland was franchisor's principal place of business). A company's principal place of business is where its officers direct, control, and coordinate the company's activities—*i.e.*, its "nerve center." *See Hertz Corp. v. Friend*, 559 U.S. 77, 93-96 (2010). Here, the record evidence demonstrates that during the franchise negotiations, ALOF's principal place of business was in Chevy Chase, Maryland. (Pl.'s Mot. at 33.) By all accounts, Maryland is where the Wallises directed, controlled, and coordinated ALOF's activities: before ALOF opened its D.C. franchise location, the Wallises instructed Maoz to forward all correspondence to an address in Maryland and the Franchise Agreement itself listed the company's Maryland address. These factors point toward the conclusion that the state of Maryland was ALOF's principal place of business during the course of franchise negotiations and execution of the contract, *see Hertz Corp.*, 559 U.S. at 93-96, which in turns renders ALOF a Maryland resident, *see*

*Joe Shifflett, Inc.*, 551 A.2d at 914 n.1.[8]  Thus, the MFRDL applies pursuant to § 14-203(a)(2)(i).

Maoz's arguments to the contrary are unpersuasive.  First, Maoz argues that ALOF is barred from bringing suit under the Maryland statute because ALOF failed to register as a foreign LLC in Maryland.  (Def.'s Mot. at 19-24.)  Maoz is correct that, in Maryland, a foreign LLC must register by filing an application with the state and paying a registration fee.  Md. Code Ann., Corps. & Ass'ns § 4A-1002.  When a foreign LLC doing business in Maryland fails to comply with these statutory requirements, it is barred from "maintain[ing] suit" in Maryland unless it (1) pays a penalty, (2) complies with the registration requirements, or (3) no longer does business in the state.  *Id.* § 4A-1007(a).  However, ALOF is not maintaining suit in Maryland in the instant context, and § 4A-1002 does not govern lawsuits in the District of Columbia.  Moreover, even if ALOF were seeking to maintain this lawsuit in Maryland, ALOF cured any registration defect prior to filing suit by registering and paying a penalty in accordance with § 4A-1007(a)(1).  (*See* ALOF MD Registration, Ex. 10 to Pl.'s Mot., ECF No. 43-12.)  Thus, Maoz's registration argument fails as a matter of law.

Second, Maoz contends that the MFRDL cannot apply because ALOF did not become a formal legal entity until May of 2007.  (Def.'s Reply at 14 ("*Sec. 14-203(a)(2)(i)* cannot be held to apply, since ALOF *was not yet formed or in existence* at the time of offer in April, 2007.  ALOF was not formed until May 25, 2007." (emphasis in original)).)  However, the text of § 14-203(a)(2)(i) clearly indicates that the

_____

[8] Maoz maintains that ALOF should not be considered a Maryland resident because the actual franchise was to be located in Washington, DC, not in Maryland.  (*See, e.g.*, Def.'s Reply at 15.)  However, it is well established that an entity's principal place of business can be in one state while it maintains other places of business—such as sales or storefronts—elsewhere.  *See Hertz Corp.*, 559 U.S. at 94.

Maryland Law applies when the "franchisee" is a resident of the state, and it is beyond dispute that ALOF was "formed" and "in existence" when it became a "franchisee"—*i.e.,* at the time the parties entered the franchise agreement, which occurred in August of 2007. (*See* ALOF's Statement of Undisputed Facts ¶¶ 8-9; Franchise Agreement at 2.) Moreover, Quinn Wallis—a Maryland resident—signed the agreement, and when a resident of a state signs a franchise agreement, courts have concluded that the franchise act of the state of residence applies. *Cf. Motor City Bagels, LLC v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 468 n.5 (D. Md. 1999) (noting that the Indiana Franchise Act applied to a franchise agreement where a resident of Indiana signed the agreement).

Third and finally, Maoz argues that it would be "unconscionable" to apply the MFRDL to this case because neither Marinov nor anyone else at Maoz knew of ALOF's Maryland residence. (*See* Def.'s Reply at 18.) But the record belies this contention: by the time the parties entered the Franchise Agreement, Marinov had mailed documents to Quinn Wallis at a Maryland address—an address that was also listed on the franchise agreement that Maoz reviewed and signed. (*See* June 2007 Emails at 2-3; FedEx Airbill at 2; Franchise Agreement at 49-52.) Maoz had every opportunity to avoid application of the MFRDL by raising this issue before executing the Franchise Agreement and moving forward on a contract with Maryland-based ALOF, and having proceeded without lodging any such objection, there is nothing unfair about Maoz being held to Maryland franchise act law standards now.

For all these reasons, this Court concludes that the MFRDL applies to the franchise agreement between ALOF and Maoz.

2. <u>The New York Franchise Sales Act</u>

The New York Franchise Sales Act ("NYFSA") applies to offers to sell that are made in New York. *See* N.Y. Gen. Bus. Law § 683(1) ("It shall be unlawful and prohibited for any person to offer to sell or sell in this state any franchise unless and until there shall have been registered with the department of law, prior to such offer or sale, a written statement to be known as an 'offering prospectus'"); *see also JM Vidal, Inc. v. Texdis USA, Inc.*, 764 F. Supp. 2d 599, 616 (S.D.N.Y. 2011) ("By its terms, the NYFSA applies only when a person offers or sells a franchise in the State of New York." (citing N.Y. Gen. Bus. Law § 683(1)). And it is well established that "[a]n offer to sell is made in [New York] when the offer . . . *originated from* [New York]." N.Y. Gen. Bus. Law § 681(12)(b) (emphasis added); *see also* Paul Kaufmann, Practice Commentaries, N.Y. Gen. Bus. L. Ch. 20, Art. 33, Refs. & Annos. (2013) (noting that New York state's position is that the statute applies to all offers "emanating from New York"). The purpose of these requirements is clear: the NYFSA applies "only to specific transactions solicited or accepted in New York, or affecting New York." *JM Vidal*, 764 F. Supp. 2d at 616 (quoting *Century Pac. Inc. v. Hilton Hotels Corp.*, No. 03-cv-8258, 2004 WL 868211, at *5 (S.D.N.Y. Apr. 21, 2004)); *Mon-Shore Mgmt., Inc. v. Family Media, Inc.*, 584 F. Supp. 186, 191 (S.D.N.Y. 1984).

Maoz's offer to sell "originated from" New York for the purposes of section 681(1) because, by Defendant's own admission, Marinov "emailed the [offering prospectus], including the Franchise Agreement, *from [his] office in New York*, to Quinn [Wallis]." (Marinov Aff. ¶ 21 (emphasis added).) Mailing the offering prospectus and proposed franchise agreement constitutes an offer. *See Kowalchuk v.*

*Stroup*, 61 A.D. 3d 118, 121 (N.Y. App. Div. 2009) (holding that a contract was formed where one party sent an offer via email); *cf. Reed v. Oakley*, 661 N.Y.S.2d 757, 759 ("[The NYFSA] is to be liberally construed to provide the protection intended by the legislature[.]").  Thus, the offer at issue here originated from New York, and the NYFSA applies.  *See* N.Y. Gen. Bus. Law § 683(1)

Defendant Maoz argues nevertheless that the NYFSA does not apply because "no part of the [franchise] transaction occurred in New York."  (Def.'s Mot. at 49-50.) Specifically, Maoz argues that the offer did not "originate[ ] from" New York because Marinov did not send the offering prospectus by mail from New York, but rather emailed it, and from Maoz's perspective, Marinov "could have been in Israel, or in New Jersey, or on a flight over the Atlantic when the 'offer was made.'"  (*Id.* at 41.) However, Marinov's own affidavit contradicts Maoz's speculation; Marinov stated that he was *in New York* when he sent the offering prospectus and proposed franchise agreement to Quinn Wallis; not in Israel or in New Jersey or on a transatlantic flight. (Def.'s Ex. 4, Marinov Aff. ¶ 21)  The undisputed evidence here confirms that the franchise offer did, in fact, originate from New York, and thus, the NYFSA applies. *See, e.g.*, *Kowalchuk*, 61 A.D. at 121.

**B.  Both Parties' Motions For Summary Judgment Must Be Granted In Part And Denied In Part With Respect To The Alleged Violations Of State Franchise Law**

Having determined that both the Maryland and New York state franchise laws apply, this Court now turns to ALOF's claims under these statutes.  As noted above, state franchise statutes typically incorporate the requirements of the FTC's Franchise Rule, including its mandates regarding registration of the franchise offering prospectus

and the timing and circumstances under which that prospectus must be provided to potential purchasers. The specific requirements of Maryland and New York state franchise law regarding registration, disclosure of the offering prospectus, and material misrepresentation are pertinent to ALOF's claims in this case, and this Court pauses to summarize them now.

First, with respect to registration, both Maryland and New York state law require a franchisor to register its offering prospectus with the state before the franchisor offers to sell or sells a franchise in that state. *See* Md. Code, Bus. Reg. § 14-214(a); N.Y. Gen. Bus. L. § 683(1). However, New York law provides an exception to the registration requirement if a single franchise is sold in response to an offer that was made to two or fewer people. *See* N.Y. Gen. Bus. L. § 684(3)(c).

Second, with respect to disclosure, both state statutes require franchisors to disclose the offering prospectus to franchisees before the sale of the franchise is made. Specifically, Maryland requires franchisors to provide prospective franchisees with a copy of the offering prospectus and proposed franchise agreement at the earlier of two weeks before the execution of the franchise agreement, two weeks before payment of any consideration is paid, or upon a franchisee's reasonable request for the document. *See* Md. Code, Bus. Reg. § 14-223. However, in New York, a franchisor must disclose its offering prospectus and proposed franchise agreement to the franchisee at the first meeting of the parties, or at least ten days before the payment of any consideration— whichever is earlier. *See* N.Y. Gen. Bus. L. § 683(8). Also, New York provides a private cause of action for the selling of a franchise without timely disclosure of the offering prospectus where Maryland does not. *See* N.Y. Gen. Bus. L. § 683; 691(1).

Third and finally, Maryland and New York statutorily prohibit material misrepresentations in connection with offers to sell a franchise. *See* Md. Code, Bus. Reg. § 14-227; N.Y. Gen. Bus. L. §§ 681, 687. These statutory provisions are similar to common law fraud claims. And, as relevant here, the Maryland and New York statutory fraud provisions are substantially identical.

ALOF maintains that there is no genuine issue of material fact regarding Maoz's violation of the registration, notice, and false statements provisions of the Maryland and New York franchise statutes. (Am. Compl. ¶ 30 (MFRDL violations); *id.* ¶ 38 (NYFSA violations).) For its part, Maoz relies primarily on the contention that Maryland and New York state franchise law are inapplicable (an argument that this Court has now rejected), and also maintains that it provided a timely copy of the Offering Prospectus to ALOF. (*See* Def.'s Mot. at 53-54 (MFRDL does not apply), 48-50 (NYFSA does not apply), 54-55 (timely disclosure under MFRDL), 44-46 (timely disclosure under NYFSA).) In regards to ALOF's fraud claims, Maoz argues that the statements in the Offering Prospectus were true when made, Maoz did not intend to defraud ALOF, and ALOF was not entitled to rely on Maoz's cost estimates. (*See* Def.'s Mot. at 24-40.) This Court has considered each of Plaintiff's and Defendant's allegations and arguments in the context of each state's franchise law, accepting some and rejecting others, as explained below.

1.    Claimed Violations Of Maryland's Franchise Statute

In Count I of the Complaint, Plaintiff ALOF alleges that Defendant Maoz violated the MFRDL in a variety of ways: (1) by failing to register its Offering Prospectus with the relevant Maryland authority; (2) by failing to disclose the Offering Prospectus to ALOF in a timely manner; and (3) by making an untrue statement of

material fact regarding start-up expenses in the Offering Prospectus and an unlawful earnings claim.  (Am. Compl. ¶¶ 22-30.)

a. *Failure To Register The Offering Prospectus*

Plaintiff ALOF contends that Defendant Maoz failed to comply with section 14-214 of the MFRDL (Pl.'s Mot. at 30), which requires a franchisor to register its offering prospectus with the state before the franchisor "offers to sell . . . or sells the franchise in the State," Md. Code, Bus. Reg. § 14-214(a).  Maoz concedes that it never registered its offering prospectus in Maryland (*see* ALOF's Statement of Undisputed Facts ¶ 12; Def.'s Reply at 14-15), but argues that it had no obligation to register in Maryland because Maryland franchise law is inapposite (a proposition that this Court has already considered and rejected) (*see* Def.'s Mot. at 53-54; Def.'s Reply at 14-15.).  Notably, Maoz's registration argument turns in part on the *timing* of its offer in relation to the formation of ALOF; that is, Maoz insists that Maryland's registration requirement did not apply because ALOF was not formed and had not yet registered to transact business in Maryland when Maoz made the franchise offer.  (Def.'s Reply at 14-15 ("[The MFRDL] cannot be held to apply, since ALOF was not yet formed or in existence at the time of the offer in April, 2007. ALOF was not formed until May 25, 2007").)  But the Maryland statute requires registration of an offering prospectus not only before the offer to sell but also before the sale itself.  *See* Md. Code, Bus. Reg., § 14-227(a) (requiring franchise to register its offering prospectus with the state before the franchisor "offers to sell. . . or sells the franchise in the state).  This means that any argument that is based on the timing of ALOF's formation relative to Maoz's registration obligation is unavailing.  Put another way, although the parties here dispute whether ALOF was in formal existence when Maoz *made the offer* to sell the franchise

(*compare* Marinov Dep. at 82-84; Activity Log at 2 (stating the offering prospectus and draft franchise agreement were sent via email in April 2007) *and* Q. Wallis Aff. ¶ 8-9 (stating that the offering prospectus and draft franchise agreement were received for the first time in June 2007) *with* ALOF Certificate of Formation (showing that ALOF was officially formed in May 2007)), there is no dispute that ALOF was in existence when the parties actually executed the Franchise Agreement. (*See* ALOF Certificate of Formation (showing that ALOF was officially formed in May 2007); Franchise Agreement at 49-52 (showing that the parties executed the Franchise Agreement on August 27, 2007).).) Consequently, whatever the status of ALOF at the time of the offer, Maoz sold a franchise to a fully-formed ALOF entity without having registered its offering prospectus in the state of Maryland, and thus, it violated Maryland's registration requirement.

This Court also notes that the limited statutory exceptions to Maryland's registration requirement do not appear to apply. *See* Md. Code, Bus. Reg., § 14-214(b)-(c). For example, the exceptions include "any [ ] transaction that the Commissioner exempts by regulation" because it is "not within the purpose" of the law and registration "is not necessary or appropriate in the public interest or for the protection of investors." *Id.* § 14-214(b)(1)-(3). While Maoz might have had an argument that registration was not "necessary or appropriate in the public interest" under the circumstances here, Md. Code, Bus. Reg., § 14-214(b)(3)(ii), only the Securities Commissioner of the Maryland Office of the Attorney General—not this Court—has statutory authority to grant such an exemption. *See id.*; *see also id.* § 14-201(d).

Accordingly, this Court concludes that, because Maoz did not register its offering prospectus in Maryland before selling a franchise in Maryland and no statutory exception applies, Maoz is civilly liable to ALOF for the failure to register prior to selling a franchise as Maryland law requires, and as a result, ALOF may seek "to recover damages sustained by the grant of the franchise." *See* Md. Code, Bus. Reg., § 14-227(a)-(b); *see also Three M Enters., Inc. v. Tex. D.A.R. Enters., Inc.*, 368 F. Supp. 2d 450, 460 (D. Md. 2005). Courts assessing analogous state franchise registration requirements have found that a franchisee must demonstrate that a franchisor's failure to register caused the harm that the franchisee sustained in order to be entitled to money damages for registration violations. *See, e.g., Long John Silver's Inc. v. Nickleson*, 923 F Supp 2d 1004, 1014 (W.D. Ky. 2013) (noting that a franchisee must prove causation to be entitled to damages for a franchisor's violation of the disclosure requirement in the Minnesota franchise act); *BMW Co., Inc. v. Workbench, Inc.*, No. 86-4200, 1988 WL 45594, at *2 (S.D.N.Y. Apr. 29, 1988) (granting summary judgment to defendant on plaintiff franchisee's disclosure claims because plaintiff had not proven that the failure to disclose the prospectus caused damages); *Dunkin' Donuts, Inc. v. HWT Assocs., Inc.*, 581 N.Y.S.2d 363, 364 (N.Y. App. Div. 1992) (affirming summary judgment for the franchisor on franchisee's disclosure claim where the franchisee had failed to establish that nondisclosure caused damages).

Here, ALOF has not pointed to any evidence that connects Maoz's failure to register its offering prospectus in Maryland to ALOF's business losses, and indeed, the record suggests that Maoz's failure to register was generally harmless. For example, it is clear on this record that ALOF was aware of the information in the Offering

Prospectus even though Maoz had not registered the document. (*See* Marinov Dep. at 75-76; Q. Wallis Aff. ¶ 9.)  Moreover, it appears that ALOF did not actually rely on statements in the Offering Prospectus regarding such matters as anticipated expenditures because ALOF generated its own figures, which were more than $100,000 higher than the estimates in Maoz's Offering Prospectus.  (*Compare* Powerpoint at 13 (the Wallises anticipating build-out costs of $375,000 for each franchise location in a presentation to potential investors) *with* 2007 Offering Prospectus at 10 (Maoz estimating initial investment and expenses for the first three months of operation to be between $149,000 and $269,000).)

What is more, the evidence points to the conclusion that ALOF's losses are largely, if not entirely, attributable to ALOF's own conduct.  For example, Maoz did not approve of the franchise location that ALOF chose (*see* Emails, Exs. 14-16 to Def.'s Mot., ECF Nos. 14-16), and ALOF lost substantial sums on historic building permit problems, issues with the landlord, and architectural problems with converting the space to a restaurant layout (*see, e.g.*, Emails Regarding Location Problems, Exs. 19-20 to Def.'s Mot., ECF Nos. 41-19, 41-20).   Likewise, Marinov told ALOF that the build-out costs would likely be higher than those listed in the 2007 Offering Prospectus before the Wallises signed the lease on that property.  (*See* Marinov Dep. at 141 ("[B]efore he signed the lease… I told him that we had figured out that the costs are higher."); Def.'s Mot at 33-34; *cf*. Powerpoint at 13 (listing ALOF anticipated build-out costs at $375,000 for each franchise location—over $100,000 more than the estimate Maoz had provided in the 2007 Offering Prospectus).)  Thus, even if ALOF could mount the causation hurdle to some degree, ALOF's clear contribution to the losses it

sustained should preclude it from recovering the majority of its requested consequential damages. *Cf. Dollar Systs., Inc. v. Avcar Leasing Syst., Inc.*, 673 F. Supp. 1493, 1504 (C.D. Cal. 1987) (withholding compensatory damages to franchisee despite franchisor's violations of Maryland, California, and Virginia franchise laws).

The MFRDL also gives this Court the option of ordering Maoz to rescind the franchise or otherwise make restitution to ALOF. Md. Code, Bus. Reg. § 14-227(c) ("A court may order the person who sells or grants a franchise [in violation of the statute] to: (1) rescind the franchise; and (2) make restitution to the person who buys or is granted the franchise."). But this Court declines to exercise its discretion in this way because Maoz's registration violation was an oversight that does not appear to have harmed ALOF in any respect. *Cf. WW, LLC v. Coffee Beanery, Ltd.*, No. 05-3360, 2013 WL 3776944, at *8 (D. Md. July 17, 2013) (granting summary judgment to defendant franchisor despite defendant's failure to register the offering prospectus and noting it was clear that the plaintiffs "did not suffer any harm from receiving the registered version of the UFOC when they did"). In this sense, ALOF is in a comparable position to the plaintiffs in *Layton v. AAMCO Transmissions, Inc.*, 717 F. Supp. 368 (D. Md. 1989). There, the court considered rescinding a franchise contract in response to technical violations under the MFRDL. *Id.* at 372. The *Layton* court decided that rescission was an inappropriate remedy, however, because "[b]y waiting for two years before filing suit, plaintiffs have given themselves an opportunity to determine if the profitability of their franchise is acceptable to them and have been responsible for the evolution of circumstances which make impossible the recreation of the conditions which existed [when the statutory violation occurred]." *Id.*

Like the *Layton* court, this Court sees no reason to permit ALOF to unravel the entire franchise agreement after the fact based on a minor violation of the Maryland statute, and thereby to "play[] a game of 'heads, we win, tails, you lose.'" *Id.* In sum, although Maoz violated the registration requirement, this technical violation did not cause ALOF any harm; consequently, ALOF is not entitled to recover money damages or to rescind the Franchise Agreement.

b. *Untimely Disclosure Of The Offering Prospectus*

ALOF contends that Maoz is also civilly liable under section 14-227(a) of the MFRDL for failure to disclose the offering prospectus in accordance with the time constraints set forth in the statute. (Pl.'s Mot. at 30.) As explained above, section 14-223 requires franchisors to provide prospective franchisees with a copy of the offering prospectus and proposed franchise agreement "at the earlier of":

> (1) 14 calendar days before the execution by the prospective franchisee of any binding agreement with the franchisor; (2) 14 calendar days before payment of any consideration that relates to the franchise relationship; or (3) a reasonable request by a prospective franchisee to receive a copy of the offering prospectus."

Md. Code, Bus. Reg. § 14-223. The parties here disagree vigorously about when Maoz sent the 2007 Offering Prospectus and draft franchise agreement to ALOF (*see* Marinov Dep. at 75-783; Activity Log at 2 (stating that the prospectus and draft agreement were sent by email on April 17, 2007); Q. Wallis Aff. ¶ 8-9 (maintaining that these documents were forwarded by postal mail on June 6, 2007)). However, with respect to section 14-223(1), even the June 6th disclosure date that Plaintiff advocates for is more than 14 days prior to the date the Franchise Agreement was executed (*see* Franchise Agreement at 49-52 (dated August 27, 2007)). With respect to section 14-223(2), there

is no evidence in the record that ALOF paid any consideration to Defendants at any time prior to August 27, 2007, which means that no statutory disclosure obligation arose by virtue of the second prong of 14-223. And with respect to § 14-223(3), ALOF presents no evidence that either Quinn or David Wallis—or anyone else on ALOF's behalf—made a "reasonable request" for the offering prospectus at any time. *See* Md. Code, Bus. Reg. § 14-223(3). Since (1) Maoz sent the offering prospectus and the franchise agreement to ALOF more than two weeks before the Franchise Agreement was executed, (2) Maoz did not pay any consideration to Defendant before the Franchise Agreement was executed, and (3) ALOF did not request a copy of the offering prospectus at an earlier date, Maoz's disclosure of the offering prospectus was timely under the statute. *See* Md. Code, Bus. Reg. § 14-223.

More importantly, even if ALOF had shown that Maoz's disclosure was untimely under the MFRDL, this provision is not "enforceable in a civil suit by a private party." *WW*, 2013 WL 3776944, at *7 (citing *Flynn v. Everything Yogurt*, No. 94-3421, 1993 WL 454355, at *7 (D. Md. Sept. 14, 1993)). Instead, Maryland courts have held that "enforcement of [disclosure violations in] § 14-223 is left to the Commissioner and the Attorney General 'except to the extent that the alleged violations also fall[ ] within § 14-227[,]'" which requires only "that the franchise offer be *registered*." *WW*, 2013 WL 3776944, at *8 (emphasis added) (quoting *Flynn*, 1993 WL 454355, at *7). In other words, the timely disclosure requirement of § 14-223 is not incorporated into § 14-227. *See id.*

This Court sees no reason to depart from the District of Maryland's well-reasoned cases holding that a franchisee, like ALOF, has no cause of action to challenge

the franchisor's untimely disclosure under the MFRDL. *See, e.g.*, *WW*, 2013 WL 3776944, at *7-8 (noting that section 14-223 is not enforceable in a civil suit by a private party); *Flynn*, 1993 WL 454355 at *6-7 (same). Moreover and in any event, the record here is devoid of evidence of any harm resulting from the allegedly late disclosure, so even if there was actionable delay in providing the offering prospectus in violation of the terms of the franchise statute, such delay was surely the type of "purely technical violation" of the statute that would make judgment for Defendant proper. *See WW*, 2013 WL 3776944, at *8. Because the allegations related to violation of the MFRDL's disclosure subsection do not give rise to a plausible claim for relief, this Court will dismiss the untimely disclosure claim in Count I. *C.f. John Doe v. Metro Police Dep't of the District of Columbia*, 445 F.3d 460, 466 (D.C. Cir. 2006) (dismissing the plaintiff's claims where no cause of action existed); *Sabre v. Int'l Sec. v. Torres Advanced Enter. Solutions*, No. 11-806, 2014 WL 341071, at *9 (D.D.C. Jan. 30, 2014) (dismissing plaintiff's claims under Rule 12(b)(6) where no cause of action existed).

### c. *Misrepresentations Regarding Initial Start-Up Costs And Earnings Statements*

Finally, ALOF contends that Maoz violated the MFRDL by making misrepresentations in its offering prospectus with respect to the initial start-up cost estimate and the earnings statement. (Am. Compl. ¶ 30c; 30d.) Section 14-227 of the MFRDL renders a franchisor civilly liable to a franchisee for offering to sell, or selling, a franchise "by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading," if the franchisee "does not

know of the untruth or omission." Md. Code, Bus. Reg., § 13-227(a)(1)(ii). The statute requires that the untrue statement or omission be false when made. *See id.* The statute further provides that the franchisor "has the burden of proving that [it] did not know and, in the exercise of reasonable care, could not have known of the untruth or omission[,]" Md. Code, Bus. Reg. § 14-227(a)(2), and that the franchisee must demonstrate that it did not know or have reason to believe that the information was false or misleading. *See* David A. Beyer & Scott P. Weber, *Estimated Initial Investment Claims: Strict Liability or Strictly Folly?*, 19 Franchise L.J. 103, 104 (2000) (citing Md. Code., Bus. Reg. § 14-227(a)(1)(ii). In addition, although the statute does not include language regarding whether the franchisee reasonably relies on the misrepresentation, Maryland courts read reasonable reliance into the statute. *See Fox v. Dynamark Sec. Ctrs., Inc.*, No. 88-1154, 1989 WL 106802, *3 (4th Cir. 1989) (noting that there was a triable issue of fact regarding the "reasonable reliance" element of a statutory misrepresentation claim).

In sum, a franchisor is civilly liable to a franchisee for statutory fraud under section 13-227 when (1) the franchisor made a statement (or failed to make a statement) to the franchisee in the course of offering to sell or selling a franchise, *see* Md. Code, Bus. Reg., § 14-227(a)(1)(ii); (2) the statement or omission was material to the franchisee's decision to buy a franchise, *see id.*, *Beyer*, *supra*, at 104; (3) the statement was false when made, *see* Md. Code, Bus. Reg., § 13-227(a)(1)(ii); (4) the franchisee did not know that the information was false or misleading, *see* Beyer, *supra*, at 104; and (5) the franchisee reasonably relied on the misrepresentation, *see Fox*, 1989 WL 106802, at *3. Conversely, in defending a fraud claim by a franchisee under section

38

13-227, the franchisor "has the burden of proving that [it] did not know and, in the exercise of reasonable care, could not have known of the untruth or omission." Md. Code, Bus. Reg. § 14-227(a)(2).

(i)  Maoz's initial start-up cost estimates

The analysis of whether Maoz's initial start-up cost estimates constitute an untrue statement of material fact under section 13-227 must begin by noting that the statements at issue are cost *estimates*, which, by definition, involve "an opinion or judgment" that is only a "rough or approximate calculation," Merriam-Webster's Collegiate Dictionary 428 (11th ed. 2003), as opposed to assertions of fact. Indeed, Maoz's 2007 Offering Prospectus specifically warned prospective franchisees that the listed costs were "*estimates only and may vary* for many reasons including the size of your Franchised Unit, the capabilities of your management team, where you locate your Franchised Unit and your business experience and acumen." (2007 Offering Prospectus at 14 (emphasis added).) Because initial start-up disclosures "are based on estimates, and are clearly labeled as such, courts have been reluctant to impose liability on franchisors" for "allegedly inaccurate disclosure of start-up costs." *See* Beyer, *supra* at 104 (collecting cases).

Moreover, even where courts have held that estimates of initial start-up expenses in an offering prospectus can form the basis of an actionable misrepresentation claim, courts "allow a franchisor to raise as a defense the fact that it exercised reasonable care and in fact did not know, or in the exercise of reasonable care, could not have known of the misstatement or omitted fact." *Id.*; *see Hanley v Doctors Exp. Franchising, LLC*, CIV.A. ELH-12-795, 2013 WL 690521 at *21 (D. Md. Feb. 25, 2013) ("[I]naccurate projections of . . . future profitability and inaccurate planning volumes could . . . be

considered fraudulent if there was evidence that the [defendant] *knew they were inaccurate* at the time they were made." (emphasis added) (citation omitted)); *see also Motor City Bagels*, 50 F. Supp. 2d at 470-71 (same under Indiana law).

Plaintiff offers two theories in support of its claim that the initial start-up cost figures at issue here were fraudulent: first, it maintains that Maoz had so little information upon which to base its numbers that Maoz's estimates were made with at least reckless disregard for the truth; and second, it asserts that Maoz willfully failed to provide updated information (in particular, the 2008 Offering Prospectus) to ALOF during the negotiations period or any time before ALOF signed the lease on its franchise location property. (Am. Compl. ¶ 30d; *see also* Pl.'s Mot. at 25-28.) Defendant responds that the initial start-up cost estimates do not constitute fraud because Maoz based the initial start-up cost estimates on the best information available when the 2007 Offering Prospectus was written (Def.'s Mot. at 25.), and no new information was available at the time the parties executed the Franchise Agreement (Def.'s Mot. at 29).

Recalling the elements of a statutory fraud claim described above, this Court notes that some of the elements are indisputably satisfied: the initial start-up estimates in the 2007 and 2008 Offering Prospectuses are statements; Maoz made the statements regarding the initial start-up costs in the 2007 Offering Prospectus as part of a sale or offer to sell a franchise; the estimates in the 2007 Offering Prospectus were ultimately incorrect; and the Wallises testified that the estimates were material to their decision to purchase a franchise. (*See* Q. Wallis Aff. ¶ 15.) *See also, e.g. Motor City Bagels*, 50 F. Supp. 2d at 470; *Beyer*, *supra*, at 108 ("Estimated initial investment costs will almost

always be deemed material.").  However, the other elements of the fraud claim—

knowledge and reliance—are wholly disputed.  Under existing law, Maoz's estimates of

start-up expenses in the 2007 Offering Prospectus can only serve as the "untrue

statement" upon which a misrepresentation claim is based if Maoz had reason to know

that the numbers were wrong when it provided the prospectus to ALOF, and if ALOF

reasonably relied on those numbers. *See* Md. Code, Bus. Reg. § 14-227(a)(2)

(franchisor may "prov[e] that [it] did not know and, in the exercise of reasonable care,

could not have known of the untruth or omission"); *Fox*, 1989 WL 106802 at *3 (noting

that there was a triable issue of fact regarding the "reasonable reliance" element of a

statutory misrepresentation claim).  As explained below, this means that these two

questions—(1) whether the initial start-up estimates in the 2007 Offering Prospectus

were false, and (2) whether ALOF reasonably relied on those initial start-up estimates—

are genuine issues of material fact that preclude summary judgment in either party's

favor.

Starting with the alleged falsity of the initial start-up estimates, it is unclear

whether Maoz had information indicating that the actual start-up costs for a United

States franchise were higher than the numbers in the 2007 Offering Prospectus at the

time Maoz disclosed that offering prospectus to ALOF.  Maoz had already completed

build-out on its New York store at the time Maoz disclosed the 2007 Offering

Prospectus to ALOF (*see* Marinov Dep. at 20 (the information for the 2007 Offering

Prospectus came from the Philadelphia store and the European stores), 46-49 (same), 94

(noting that two more stores in New York were built in 2007)), and the build-out costs

of the New York store were, indeed, higher than those listed in the 2007 Offering

Prospectus.  (*Compare* 2007 UFOC at 11 *with* 2008 UFOC at 11; *see also* Marinov Dep.

at 93-94)  According to ALOF, Maoz should have updated the costs in the 2007

Offering Prospectus to reflect the New York numbers or should have at least disclosed

the increase to ALOF, and by failing to do so, Maoz misrepresented its own estimates

of start-up expenses.  (Pl.'s Mem. at 25-28)  But Maoz maintains that it had not yet

compiled all of the relevant financial information by August 2007, so Maoz did not

know that the costs differed from those in the prospectus.  (*See* Def.'s Mot. at 27-29.)

In a related context in a different case, a U.S. district court in Maryland found

that failure to provide updated or corrected start-up cost information may rise to the

level of a material misrepresentation in violation of an analogous franchise provision.

*See Motor City Bagels*, 50 F. Supp. 2d at 469-71 (D. Md. 1999) (addressing fraud

claims under the Indiana Franchise Act).  In that case, the plaintiffs received from

defendant franchisor, American Bagel Company, an offering prospectus that included

estimates of start-up expenses and a statement that those estimates were "based on the

latest available data[.]" 50 F. Supp. 2d at 466.  The plaintiffs used those cost estimates

"as a central assumption" of their detailed business plan to analyze the viability of

opening a franchise.  *Id.*  At some point before the plaintiffs purchased the franchise,

the defendant completed and filed an updated offering prospectus with increased cost

estimates.  *Id.*  Notably, the plaintiffs conceded that they received another offering

prospectus, but argue that the start-up cost estimates were the same as before—*i.e.*, the

franchisor had withheld the increased cost information.  *Id.*  The plaintiffs then

purchased two franchises.  *Id.*  Thereafter franchisor updated and re-filed the offering

prospectus, and increased the start-up cost estimates for a second time, but the plaintiffs

alleged that they never received the new document or learned of the increase. *Id.* at 466-67. Ultimately, the plaintiffs' actual start-up costs "greatly exceeded the amounts represented by the defendants in the [first] UFOC[.]" *Id.* at 467. The court in *Motor City Bagels* found that there was a genuine issue of material fact regarding whether there was an actionable misrepresentation claim under the applicable franchise statute based largely on the fact that an updated offering prospectus existed—the data was calculated, the estimates increased, and the document was filed with the state—that might not have been provided to the plaintiffs. *See id.* at 471; *see also Hanley*, 2013 WL 690521, at *21.

Somewhat different circumstances are presented in the case at bar. Unlike *Motor City Bagels*, it is undisputed here that there was no updated offering prospectus already in existence when ALOF received the 2007 version or even when the parties executed the Franchise Agreement in August 2007. There is a question of fact, however, regarding whether Maoz had the information regarding increased costs at its disposal *before* it completed the 2008 Offering Prospectus; specifically, at the time Maoz executed the Franchise Agreement.[9] Failure to provide updated information that the defendant knows of—whether that information has made it into a formally registered offering prospectus or not—gives rise to liability under § 14-227(a)(1)(ii). *See Hanley*, 2013 WL 690521, at *23; *Motor City Bagels*, 50 F. Supp. 2d at 473.

This Court also recognizes that whether Maoz's initial start-up estimates were actually false when made is only a "material" fact for the purpose of the summary

---

[9] Although ALOF also faults Maoz for not sharing the updated offering prospectus before ALOF signed onto lease property for its Maoz franchise in 2008, the relevant time period for the statutory fraud claim is the time of *offer or sale* of a franchise, not thereafter. *See* Md. Code, Bus. Reg. § 14-227(a)(1) (a franchisor is liable for "offer[ing] to sell or sell[ing] a franchise" "by means of an untrue statement").

judgment standard if it was reasonable for ALOF to rely upon the specific cost estimates listed in the offering prospectus; that is, reasonable reliance presents yet another jury question. On the one hand, Maoz provided the cost estimates based on years of practice opening Maoz vegetarian restaurants, a particular business venture with which the Wallises had no previous experience. On the other hand, the 2007 Offering Prospectus contained extensive disclaimers noting that the estimates were just that approximations and that the figures were subject to change based on a number of factors. (*See* 2007 Offering Prospectus at 12-14 nn. 1-18.) Furthermore, despite the fact that the Wallises were new to the restaurant business, they boasted significant expertise and business savvy (*see* Powerpoint at 4-5), and hired a team of accountants to conduct their own in-depth estimate of potential start-up costs (*see* ALOF Projected Financial Statements, Ex. 26 to Def.'s Mot., ECF No. 41-26 at 5). Given the prospectus's disclaimers and ALOF's business acumen, there is a question of fact regarding whether it was reasonable for ALOF to rely on the start-up cost estimates listed in Maoz's 2007 Offering Prospectus. *See Emfore Corp. v. Blimpie Assocs.*, 860 N.Y.S.2d 12, 14 (N.Y. App. Div. 2009) (finding reasonable reliance was a question for the jury); *Motor City Bagels*, 50 F. Supp. 2d at 470 (same). Thus, the reasonableness of ALOF's alleged reliance on Maoz's estimates is a question for a jury to decide. *See id*.

In short, there are genuine issues of material fact regarding ALOF's misrepresentation claim under Maryland law based on the initial start-up cost estimates—specifically, the questions of (1) whether Maoz's initial start-up estimates were actually false when made, and (2) whether ALOF reasonably relied on that initial start-up estimate. Therefore, the complaint's contention that Maoz's initial start-up

cost estimates constituted statutory fraud under the MFRDL present triable issues of fact, and this Court will deny both cross-motions for summary judgment with respect to this claim.

(ii)    Maoz's earnings statement

ALOF also contends that Maoz violated the MFRDL by making an "unlawful earnings statement" (Am. Compl. ¶ 30(c)) in its 2007 Offering Prospectus. The gravamen of Plaintiff's unlawful earnings statement allegation is that Maoz misrepresented in Item 19 of the offering statement that it did *not* make any earning statements, when it actually had done so during the negotiations process. (Am. Compl. ¶ 21; Pl.'s Mot. at 23-24.) In other words, the claim is not that Maoz made a statement of future earnings that turned out to be inaccurate, but rather that Maoz did, in fact, make a statement regarding future earnings while disclaiming the making of any such statement in its 2007 Offering Prospectus. With the respect to the underlying representation regarding potential earnings, the allegation is that during the negotiations process Maoz made an "earning claim," which the FTC defines to include "any oral, written, or visual representation to a prospective franchisee which states or suggests a specific level or range or potential or actual sales, income, gross or net profits." Final Interpretive Guides for Disclosure Requirements & Prohibitions Concerning Franchising, 44 Fed. Reg. 49,966 at 49,982 (Aug. 24, 1979), *codified at* 16 C.F.R. Part 436. ALOF contends that the MFRDL prohibits any and all misrepresentations about earnings, including a false certification that no earnings claim was made with respect to the franchise negotiations. (*See* Am. Compl. ¶ 30(c).)

Defendant Maoz responds in the first instance that projections of future earnings are statements of opinion rather than statements of material fact, so they cannot serve as

45

the basis of a fraud claim. (Def.'s Mot. at 39.) In the alternative, Maoz contends that ALOF was not entitled to rely on the alleged statement about future earnings because (1) the offering prospectus specifically disclaimed that any such earning statement was made; and (2) ALOF's personnel had significant business experience and sophistication. (Def.'s Mot. at 31-40, 48.) Defendant's arguments in this regard do not precisely respond to Plaintiff's misrepresentation claim because, as stated above, ALOF is not contending that the alleged earning statement itself was false.

Notwithstanding Defendant's non-responsiveness, ALOF's claim still fails as a matter of law because ALOF has not adduced sufficient facts to prove that anyone from Maoz made any statement projecting ALOF's future earnings in contravention of its representation in the Offering Prospectus that no such statement was made. A misrepresentation claim under the MFRDL is a type of fraud claim, *cf. Vysovsky v. Glassman*, No. 01-2531, 2007 WL 3130562, at *10 (S.D.N.Y. Oct. 23, 2007) (stating that a similar claim under New York law is a fraud claim), so plaintiffs must allege facts with specificity and must prove a prima facie statutory misrepresentation claim by clear and convincing evidence. *Hughes*, 867 F. Supp. 2d at 92; *Zirintusa*, 674 F. Supp. 2d at 8; *ABB Daimler-Benz Transp.*, 14 F. Supp. 2d at 85. Far from rising to this level, ALOF's complaint provides only vague allegations describing the alleged statement about earnings (*see* Am. Compl. ¶ 21 ("During the franchise sales process, Maoz provided ALOF with information regarding projected cost percentages and profit percentages for each unit, despite disclaiming that it was making earnings claims in Item 19 of the UFOC.")), which fall far short of the heightened pleading standard required for fraud claims. *See* Fed. R. Civ. P. 9(b).

Even more important, during the course of discovery, ALOF produced only Quinn Wallis's threadbare affidavit to support the allegation that a statement about earnings was provided.  In the affidavit, Quinn Wallis identifies Marinov as the individual who made the statement, but he provides no further detail whatsoever regarding the timing or substance of the statement or the extent of ALOF's reliance on any such statement.  (Q. Wallis Aff. ¶ 11.)  ALOF has not offered any other evidence or information about this claim, such as when the alleged statement was made or whether it was written or oral, nor has ALOF provided evidence regarding the statement's content.  On the other hand, Marinov maintains that he never gave ALOF information regarding project cost or profit percentages on the advice of his lawyer. (Marinov Dep. at 92.) Indeed, Marinov testified that he "told every franchisee that [he] met that [he's] not allowed to predict any kind of income or sales" because "[e]ach unit is different" and earnings "depend[ ] a lot [on] the volume of the store." (*Id.* at 93.)  ALOF has so clearly failed to present clear and convincing evidence that such a claim was made that no reasonable juror could conclude that the statement was made.  Hence, Defendant is entitled to summary judgment on this claim.

Notably, even if ALOF had produced clear and convincing evidence that such a statement about earnings was made, it is not clear to this Court that ALOF would be entitled to claim reasonable reliance on any alleged earnings statement.   The Offering Prospectus clearly states that Maoz "do[es] not furnish nor authorize [its] salespersons to furnish any oral or written information concerning the actual or potential sales, expenses or income of a MAOZ VEGETARIAN Unit.  Actual results vary from unit to unit and we cannot estimate the result of any particular franchise." (2007 Offering

Prospectus at 34.) Quinn Wallis also specifically certified in writing that no "employee or other person speaking on [Defendant's] behalf made any statement or promise concerning the revenues, profits or operating costs of a Maoz Vegetarian unit that [they] or [their] franchises operated[.]" (Questionnaire, Def.'s Ex. 27, ECF No. 41-27, at 3.) "Courts are divided as to whether such disclaimers and qualifications in [offering prospectuses] and franchise agreements preclude reasonable reliance on a franchisor's representations[,]" *Hanley*, 2013 WL 690521, at *27, with a many courts holding that reliance in the face of such disclaimers is unreasonable. *See McDonald v. Friedman*, No. 02-2812, 2004 WL 3397805, at *8-9 (D. Md. 2004) (collecting cases showing that a plaintiff alleging fraudulent misrepresentations during the course of contract negotiations cannot reasonably rely on such statements when faced with clear contractual language to the contrary); *see also* Karen B. Satterlee & Kerry L. Bundy, *"You Made Me Do It": Reliance in Franchise Fraud Cases*, 26 Franchise L. J. 191, at 193 & 193 n.26 ("When the [the offering prospectus or other documents] expressly state[ ] that the franchisor was not providing any information about sales, profits, or earnings projections, and that no agent or representative of the franchisor was authorized to make any sales, profit, or earnings projections, courts have consistently held that reliance on such oral representations is unreasonable." (collecting cases)); *but see Solanki*, No. 12-Civ-0027, 2014 WL 320236, at *4-5 (S.D.N.Y. Jan. 29, 2014) (franchise laws do not allow disclaimers of rights); *Hanley*, 2013 WL 690521, at *27 (citing *Ellering v. Sellstate Realty Sys. Network*, 801 F. Supp. 2d 834, 855-45 (D. Minn. 2011). This Court, too, questions whether reliance on any such earnings statement by

ALOF in the face of the unambiguous disclaimers and its own certification of nonreliance could be considered reasonable.

* * *

To summarize the Court's conclusions at this point in the analysis, with respect to the violations of MFRDL alleged in Count I of the complaint, this Court will grant summary judgment for ALOF on the registration violation, but will not award either damages or rescission as a remedy for that violation. The Court will dismiss the untimely disclosure claim for failure to state a claim. The Court will deny both cross-motions for summary judgment on ALOF's statutory fraud claim based on estimated start-up costs given the genuine issues of material fact regarding the falsity of the listed costs and whether ALOF was entitled to reasonably rely on those numbers. Finally, the Court will grant Maoz's motion for summary judgment on the unlawful earnings statement claim.

2.      Claimed Violations Of New York's Franchise Sales Act

In Count II of the complaint, ALOF brings statutory claims under New York's analogous state franchise law, the New York Franchise Sales Act ("NYFSA"), that are substantially similar to those just discussed. (Am. Compl. ¶¶ 31-38.) Specifically, Plaintiff alleges that Maoz violated the NYFSA by (1) offering to sell a franchise in New York without having registered its Offering Prospectus in that state, (2) failing to provide the Offering Prospectus to the franchisee in a timely manner, and (3) making an untrue statement of material fact regarding initial start-up costs and an unauthorized earnings claim. (*Id.*) As with the Maryland law analysis, this Court concludes that ALOF is entitled to summary judgment both on the claims that Maoz violated the

NYFSA registration requirement and failed to make a timely disclosure of the offering prospectus, and that Maoz is entitled to summary judgment on the claim that it made an unlawful earning statement. The Court similarly concludes that neither party is entitled to summary judgment on the initial start-up cost estimate claim because there are genuine issues of material fact regarding whether the statements were false when made and whether it was reasonable for ALOF to rely on those statements.

<blockquote><em>a. Failure To Register The Offering Prospectus</em></blockquote>

Section 683 of the NYFSA requires a franchisor to register with the state prior to making an offer to sell or actually selling a franchise. N.Y. Gen. Bus. L. § 683(1) ("It shall be unlawful and prohibited for any person to offer to sell or sell in this state any franchise unless and until there shall have been registered with the department of law, prior to such offer or sale, a written statement to be known as an 'offering prospectus[.]'"). There is an exception to this registration requirement that exempts a franchisor only if

> [t]he transaction is pursuant to an offer directed by the
> franchisor to not more than two persons, other than persons
> specified in this subdivision, if the franchisor does not grant
> the franchisee the right to offer franchises to others, a
> commission or other remuneration is not paid directly or
> indirectly for soliciting a prospective franchisee in this state,
> and the franchisor is domiciled in this state or has filed with
> the department of law its consent to service of process on the
> form prescribed by the department.

*Id.* § 684(3)(c). Maoz had not registered its offering prospectus in New York at any time before the sale was executed on August 27, 2007. Instead, Maoz *applied* for registration on June 6, 2007 (Pl.'s Ex. 5, Maoz Franchise Application, ECF No. 43-7), and the state of New York approved Maoz's application on September 4, 2007. (Pl.'s

Ex. 8, Maoz NY Registration Letter, ECF No. 43-10.) This means that Maoz had not, in fact, secured registration at the time the franchise sale was executed on August 27, 2007. (*See* Franchise Agreement at 61 (dated franchise agreement)).

Acknowledging as much, Defendant argues that its registration requirement should be waived under the NYFSA's "isolated sales exemption," (with respect to which Defendant refers to N.Y. Gen. Bus. L. § 684(3)(c), which is quoted above). This statutory provision plainly permits a franchisor to waive otherwise applicable registration requirements in the context of "the sale of a single franchise accomplished 'pursuant to an offer directed by the franchisor to not more than two persons[.]'" *Burgers Bar Five Towns, LLC v. Burger Holdings Corp.*, 897 N.Y.S.2d 502, 504 (N.Y. App. Div. 2010). There is little case law interpreting the isolated sales exemption, yet Defendant maintains that it is "well[-]settled law in New York" that the isolated sales exemption is understood to permit "U.S. franchisors or foreign franchisors that are new to the United States" to "sell one franchise in New York without having to register a disclosure document with the state." (Def.'s Mot. at 42.) In support of this argument, Defendant cites three New York cases—*Burgers Bar Five Towns, LLC*, 897 N.Y.S.2d at 504, *National Survival Game of New York, Inc. v. NSG of LI Corp.*, Bus. Franchise Guide (CCH) ¶ 9294 (Sup. Ct. West. Co. 1988), and *BMW Co. v. Workbench Inc.*, No. 86-CIV-4200, 1988 WL 45594 (S.D.N.Y. Apr. 29, 1988)—and a journal article, George J. Eydt, *Living in the Shadow of* National Survival Game, Franchising Bus. & L. Alert, 18 Law J. Newsletters, no. 4, Jan. 2012. But it is clear to this Court that the interpretation of the NYFSA's isolated sales exemption is far from "well-settled."

Defendant's first case, *Burgers Bar*, addressed neither the scope of the isolated sales exemption nor the circumstances under which it may apply. 897 N.Y.S.2d at 504. Rather, the court in *Burgers Bar* only found that the issue of whether or not the isolated sales exemption applied under the circumstances presented in that case was a genuine issue of material fact for trial. *Id.* Moreover, the facts of *Burgers Bar* are distinguishable from the case before this Court because the defendant in *Burgers Bar* was the owner of a single restaurant who sold a single franchise, *see id.* at 503-04, whereas Defendant Maoz is the owner of multiple restaurants and was formed for the express purpose of selling franchises and supporting franchisees (2007 Offering Prospectus at 5). Because the sale in *Burgers Bar* appear to be infinitely more "isolated" than the sale in this case, *Burgers Bar* provides little guidance to this Court regarding the applicability of the exception in the instant context.

Defendant's second case, *National Survival Game*, did indeed hold that the isolated sales exemption applied to absolve the defendant of compliance with the registration requirement, but the facts of *National Survival Game* are distinguishable from the instant case because, in that case, "the uncontradicted evidence establishe[d]" that defendants "neither [ ] negotiated nor entered into a contract with any individuals or corporations" other than the plaintiffs. *See National Survival Game*, Bus. Franchise Guide (CCH) ¶ 9294 at 19624. Here, Maoz's own Activity Log indicates that it had made over 15 franchise offers by the time the parties executed the Franchise Agreement (Activity Log). Thus, as was the case with *Burgers Bar*, defendant's citation to *National Survival Game* does not assist this Court in its analysis of the applicability of the isolated sales exemption to the franchise sale in the instant case.

Defendant's third case, *BMW Co. v. Workbench Inc.*, No. 86-CV-4200, 1988 WL 45594 (S.D.N.Y. Apr. 29, 1988), does not reference the isolated sales exemption at all, but instead held that the plaintiffs were not entitled to damages or rescission for violations of the NYFSA because the violations were not material to the plaintiffs' decision to purchase the franchise. *Id.* at *2. The Eydt article, "*Living in the Shadow of* National Survival Game" also cites this 1988 *BMW* decision for the proposition that the isolated sales exemption provision has "been interpreted to mean that the sale of the first franchise unit is exempt from registration if the unit was only offered to a maximum of two people." Eydt, *supra*, at 2. In another decision from that same case— *BMW Co. v. Workbench, Inc.*, No. 86-cv-4200 (S.D.N.Y. Jun. 10, 1987)—the Southern District of New York considered the argument that the isolated sales exemption applied because, although the franchisor offered a number of franchises for sale, "no such offer was made to more than two persons in connection with any one franchise."[10] The court *rejected* that proposition, reading the isolated sales exemption to apply "only when a franchisor limits itself to making not more than two franchise offers" and sells one franchise. *Id*.

Finding the case law less than illuminating, this Court reviewed the NYFSA's legislative history and finds that it sheds some light on the meaning and purpose of the statutory language that is now known as the isolated sales exemption. The drafter of the NYFSA has stated that section 684(3)(c) was intended to be interpreted narrowly, and "does not mean that if a franchisor only sells franchises one at a time, and offers

---

[10] This decision is not published anywhere. Copies of this decision may be obtained from the clerk of court. Alternatively, the document can be found at http://www.ag.ny.gov/sites/default/files/pdfs/bureaus/investor_protection/franchise/BMW_Co.pdf (last visited September 29, 2014.)

each such franchise to no more than two persons, it need never register" its offering prospectus. David J. Kaufmann, Suppl. Practice Commentary to McKinney's N.Y. Gen. Bus. L. Ch. 20, Art. 33 (§§ 680-695), New York Franchise Act, Refs. & Annos. (2013). Rather, the exemption should only apply when a franchisor "limits itself to selling *one franchise*." *Id.* (emphasis added) (citing *BMW Co. v. Workbench, Inc.*, No. 86-cv-4200 (S.D.N.Y. Jun. 10, 1997); *see also* Karen B. Satterlee & Leslie D. Curran, Exemption-Based Franchising: Are You Playing In A Minefield?, 28 Franchise L.J. 191, 197 (noting that "the key" to state single franchise rules, such as New York's, "is that the franchisor must limit the number of franchises offered for sale"). This is not to say that a franchisor who has sold an unregistered franchise under the isolated sales exemption can never again offer to sell a franchise in New York; "[i]t can, but it must register first. And it must be able to demonstrate to the attorney general why its previous 'isolated sale' was distinct from the general offer of franchises to be effectuated pursuant to its franchise registration." David J. Kaufmann, *Exemptions Under the New York Franchise Act*, N.Y.L.J. Online, Feb. 28, 2012.

Thus, there is some support for interpreting the "isolated sales exemption" in the NYSFA to permit the owners of a store to grant *a single franchise* of that retail establishment without registration. Such is not the case here (*see* Activity Log), and Maoz's planned franchise expansion hardly renders ALOF's franchise an "isolated" occurrence. For this reason, this Court finds that the isolated sales exemption did not exempt Maoz from registering its offering prospectus in New York before making the offer to sell, or selling, the franchise to ALOF. And because the record is clear that

Maoz had not registered its offering prospectus at the time it made an offer or actually sold a franchise to ALOF, Maoz violated the NYFSA registration requirement.

Significantly, even though Maoz may be liable to ALOF for the registration violation, New York courts considering related claims under the NYFSA have found that there can be no damages without causation. *See, e.g.*, *BMW*, 1988 WL 45594, at *2 (granting summary judgment to defendant on plaintiff franchisee's disclosure claims because plaintiff had not proven that the failure to disclose the prospectus caused damages). As described in Section III.A.ii.a.1, *supra*, other courts have similarly read causation into analogous provisions of other state franchise regulations, *see, e.g.*, *Long John Silver's*, 923 F. Supp. 2d at 1014, and this Court finds no reason to depart from this practice under the circumstances presented in this case. ALOF has not proffered any evidence that demonstrates that Maoz's technical registration violation caused ALOF's business losses; therefore, money damages will not be awarded for this technical violation.

With respect to ALOF's claim that it is entitled to rescission of the franchise agreement, the NYFSA allows for rescission of a franchise agreement only when the franchisor's statutory violation is "willful and material." N.Y. Gen. Bus. L. § 691(1); *see also Palazzetti Import/Export, Inc. v. Morson*, No. 98-cv-0722, 1999 WL 420403, at *2 (S.D.N.Y. June 23, 1999) (citation omitted). Maoz's failure to register its offering prospectus does not warrant rescission in this case, because, as explained below, even if Maoz's failure to register was willful, this Court concludes that no reasonable jury could find that the violation was material to ALOF's investment decision.

Courts interpret willfulness in the context of the NYFSA to mean "voluntary and intentional, as opposed to inadvertent." *Reed v. Oakley*, 661 N.Y.S.2d 757, 759 (Sup. Ct. N.Y. 1996) (citation omitted), *aff'd*, 659 N.Y.S. 2d 820 (N.Y. App. Div. 1997); *see also Burgers Bar Five Towns, LLC v. Burger Holdings Corp.*, 897 N.Y.S.2d 502, 504-05 (N.Y. App. Div. 2010); *Leung v. Lotus Ride, Inc.*, 604 N.Y.S.2d 65, 67 (N.Y. App. Div. 1993); *Baker Boys of Glendale, Inc. v. 35-63 82nd St. Corp.*, 560 N.Y.S.2d 465, 467 (N.Y. App. Div. 1990). Plaintiffs contend that Maoz's violation was intentional, and this Court agrees: the fact that Maoz submitted a registration application on June 26, 2007, demonstrates that Maoz knew it was required to register specifically in New York, but it nevertheless failed to complete the registration process before making the franchise sale. (Pl.'s Mot. at 32; *see also* Maoz NY Registration Appl.) This intentional failure to register the offering prospectus prior to selling the franchise meets the "voluntary and intentional" standard that the NYFSA requires. *See Reed*, 661 N.Y.S.2d at 759; *cf. Burgers Bar Five Towns*, 897 N.Y.S.2d at 504-05; *Leung*, 604 N.Y.S.2d at 67; *Baker Boys of Glendale*, 560 N.Y.S.2d at 467.

However, ALOF cannot establish the additional requirement that the willful violation was material. Although ALOF alleges in a wholly conclusory manner that the "offer to sell the franchise to ALOF prior to registering in New York was . . . material" (ALOF's Statement of Undisputed Facts ¶ 13), the record belies that assertion. First, neither Quinn nor David Wallis testified that they would not have gone forward with the sale if they had known that Maoz had not yet registered its offering prospectus. (*See* D. Wallis Aff. ¶¶ 1-6; Q. Wallis Aff. ¶¶ 8-12, 19.) In fact, the record evidence indicates that it was Quinn Wallis who repeatedly initiated meetings with Marinov to

further franchise negotiations, even after Marinov admitted to him that the delay in the negotiations was attributable to the fact that Maoz had not yet registered its Offering Prospectus with the relevant authorities. (*See* Summer 2006 Marinov Emails, Ex. 9 to Def.'s Mot., ECF No. 41-9 at 2 (Quinn Wallis noting that Maoz was going through the "legal process" of registering a prospectus).) Viewing these facts in the light most favorable to ALOF—as required for the purposes of Defendant's motion for summary judgment, *see Vaughn*, 892 F. Supp. 2d at 91-92—ALOF has failed to demonstrate the existence of a triable issue of fact regarding materiality, so Maoz's failure to register its offering prospectus does not entitle ALOF to rescission. *See Baker Boys of Glendale, Inc.*, 560 N.Y.S. at 467; *see also BMW Co., Inc. v. Workbench, Inc.*, No. 86-CIV-4200, 1988 WL 45594, at *2 (S.D.N.Y. Apr. 29, 1988) (denying rescission of the franchise agreement where defendant had failed to register or disclose the offering prospectus finding the violation of the Franchise Act was not material to the plaintiff's decision to purchase the franchise).

     b.  *Untimely Disclosure Of The Offering Prospectus*

   The NYFSA differs from the MFRDL insofar as New York law provides a cause of action for the selling of a franchise without timely disclosure of the offering prospectus. *See* N.Y. Gen. Bus. L. § 691(1) (noting that selling a franchise in violation of section 683 leads to civil liability); *id.* § 683 (setting forth the disclosure requirements). Specifically, a franchisor subject to registration under the law must disclose its offering prospectus and proposed franchise agreement to the franchisee at the earlier of "(a) the first personal meeting between the franchisor or its agent and the prospective franchisee," or "(b) at least ten business days prior to the execution of a

binding franchise or other agreement" or "(c) at least ten business days prior to the receipt of any consideration in connection with the sale or proposed sale of a franchise." *Id.* § 683(8). The regulation defines "first personal meeting" as "the first face to face meeting between a franchisor or franchisor's agent or any representative or employee thereof and a prospective franchisee which is held for the purpose of discussing the sale or possible sale of a franchise[.]" *Id.*

Defendant contends that it is not subject to liability for a disclosure violation in this case because Maoz was exempted from the disclosure requirements due to the isolated sales exemption (Def.'s Mot. at 46-48), but as explained above, this exemption does not apply.[11] In the alternative, Defendant argues that Maoz did, in fact, disclose the offering prospectus to ALOF on the date of their first personal meeting in April 2007. (*Id.* at 44-46.) ALOF argues that Maoz failed to disclose the offering prospectus at the first personal meeting—which they maintain was in September 2006—and also failed to disclose the offering prospectus at any time before the April 2007 meeting. (Pl.'s Mot. at 20.) Given that Maoz was legally obligated to disclose the offering prospectus to ALOF at the first personal meeting, *see* N.Y. Gen. Bus. L. § 683.8, this Court must consider and resolve the dispute regarding when the parties here first met

---

[11] Contrary to Defendant's argument, even if the isolated sales exemption in § 684(3)(c) applied to excuse Maoz's failure to *register* its offering prospectus—which it does not—the isolated exemption would not necessarily also exempt Maoz from the statutory disclosure requirement. At least one federal court has examined the carry-over from registration to disclosure obligations in the context of another exemption in this same statutory section, and it concluded that the registration waiver does not excuse a disclosure violation. *See Olivieri v. McDonald's Corp.*, 678 F. Supp. 996, 1000 (E.D.N.Y. 1988) (noting that even if a franchisor is exempt from registration, it is still required to comply with the disclosure and antifraud requirements of the act); *see also* Leonard D. Vines, et al., Damage Control For Violations of Registration & Disclosure Obligations, 24 Franchise L.J. 191, 195 & 195 n.34 (citation omitted); Eydt, *supra* (contending that the isolated franchise exemption would be more "useful" if it also exempted franchisors from the disclosure requirement). The legislative mandate to construe the NYFSA broadly to protect franchisees, *see* N.Y. Gen. Bus. L. § 680; *Reed*, 661 N.Y.S.2d at 759; *A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc.*, 618 N.Y.S.2d 155, 159, 161, provides an additional reason to view Defendant's carry-over argument with a skeptical eye.

and when the offering prospectus was disclosed.  Plaintiff here contends that the first personal meeting between the parties occurred on September 18, 2006, but Maoz denies that any meeting took place in September of 2006.  (*See* Def.'s Reply at 21 n. 18.) Nearly all of the evidence in the record before the Court—including the emails between Marinov and Quinn Wallis planning the September meeting and discussing the possibility of opening a Maoz franchise in the District of Columbia (*see* Summer 2006 Marinov Emails), the testimony of both Quinn and David Wallis regarding the September meeting, and the Wallises' train tickets for that meeting (*see* Tickets)—and, indeed, *all* of the related evidence except Marinov's own deposition—confirms Plaintiff's position.  (*Compare* Pl.'s Mot. at 20 *with* Marinov Dep. at 76-77.)  And when pressed, Marinov never flatly states that the September meeting *did not occur*, just that he could not remember whether or not it happened.  (Marinov Dep. at 77.)  This Court concludes that, given the weight of this evidence, no reasonable person could believe that the September meeting did not occur.  *See Alford v. Providence Hosp.*, 945 F. Supp. 2d 98, 107 (D.D.C. 2013) ("[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *cf. Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 215 (D.D.C. 2010) (where the court is presented with "a classic 'he said, she said'" in which "the facts are in diametric opposition[,]" the court cannot make factual determinations, but if one party's version of the facts is so implausible that "no reasonable juror would undertake the suspension of disbelief necessary to credit" that version, the court can resolve the

factual dispute on summary judgment (citation omitted)). Moreover, the facts in the record demonstrate that the purpose of that September 2006 meeting was to discuss the possibility of the Wallises opening a Maoz franchise in Washington, DC. (*See, e.g.*, Q. Wallis Aff. ¶¶ 2-3; D. Wallis Aff. ¶ 2; Summer 2006 Marinov Emails.)

Similarly, no reasonable juror could conclude that the meeting of April 17, 2007—which both parties admit occurred—was anything other than a conference to discuss the possibility of the Wallises purchasing a Maoz franchise. It strains credulity to conclude otherwise. The facts in the record demonstrate that Quinn Wallis and Marinov had been discussing the possibility of the Wallises opening a Maoz franchise in the District of Columbia for several month at that point in time. (*See, e.g.*, Q. Wallis Aff. ¶¶ 2-3; D. Wallis Aff. ¶ 2; *see also* Marinov Dep. at 27 (Marinov knew that the Wallises had been meeting with Maoz representatives since June 2006 to discuss their "interest[ ] in opening . . . Maoz store in Washington, D.C.").) Defendant even appears to concede that the purpose of the April 2007 meeting was to discuss the sale of a franchise, and furthermore, to *offer* a franchise for sale. (*See* Def.'s Reply at 14 (arguing that Maoz made an offer to sell in April 2007); Def.'s Mot. at 12 (arguing that Marinov emailed the offering prospectus to Quinn Wallis on the same day as the April 17 meeting (citing Marinov Dep. at 99)).) Thus, even if the meeting of September 2006 did not occur or did not involve sales discussions, the meeting of April 2007 undoubtedly qualifies as the "first personal meeting" between the parties, such that disclosure of the offering prospectus was required at that time. *See* N.Y. Gen. Bus. L. § 683(8).

It is undisputed that neither Marinov nor anyone else from Maoz provided a copy of the offering prospectus at either of the two possible "first personal meetings." (*See* Marinov Dep. at 98-99; Q. Wallis Aff. ¶ 5-9.)[12]  Consequently, Maoz clearly in violation of the NYSFA's disclosure requirement. *See* N.Y. Gen. Bus. L. § 683(8). Accordingly, the Court will grant summary judgment to ALOF on Count II to the extent it alleges a violation of the NYFSA disclosure requirement.

It should come as no surprise that, pursuant to the now familiar analysis regarding the appropriate remedy for a violation of this nature, this Court also concludes also that ALOF is not entitled to monetary damages as a result of its failure to disclose the offering prospectus at the first possible meeting of the parties.  The causation requirement is even harder to fulfill in this context than it was with the other technical violations that this Court analyzed *supra*, for it is undisputed that Maoz provided a copy of the offering prospectus at some point prior to the execution of the franchise agreement on August 27, 2007, so at most there was a slight delay in providing ALOF with the requisite information (*i.e.,* a nominal violation), and no reasonable jury could find that ALOF's significant business losses were the result of untimely disclosure, as the NYFSA requires.  *See BMW*, 1988 WL 45594, at *2; *Dunkin' Donuts, Inc.*, 581 N.Y.S.2d at 364; *Long John Silver's Inc.*, 923 F Supp. 2d at 1014.  In fact, Plaintiff's claims in this case have nothing whatsoever to do with the *timing* of Maoz's disclosure of the 2007 Offering Prospectus, as might have been the case if there was any evidence that the Wallises had insufficient time to review the

---

[12] Defendant insists that Marinov emailed the prospectus to Quinn Wallis on the same date as the meeting (Def.'s Mot. at 45-46; Marinov Dep. at 77, 84, 98-99, 157), but there is no entry to this effect in the purportedly contemporaneous Activity Log, and neither Marinov nor anyone else at Maoz was able to identify that email during the course of discovery.

prospectus prior to purchasing the franchise. Instead, and quite to the contrary, the gravamen of ALOF's claims homes in on the *content* of the Offering Prospectus; ALOF asserts, in particular, that the Wallises had so studied and accepted the information in the 2007 Offering Prospectus that they relied to their detriment on what Maoz had stated therein when ALOF undertook to purchase a franchise. It is clear beyond cavil that ALOF cannot have it both ways: it cannot maintain that it relied heavily on the offering prospectus, on the one hand, and suggest, on the other, that the disclosure of that same document was so tardy that ALOF did not have time to review it, causing compensable damages. Because there is no evidence connecting the untimely disclosure to ALOF's business losses, and especially in light of ALOF's explicit argument that it relied on the content of the Offering Prospectus, this Court finds as a matter of law that Plaintiff will be unable to prove causation. Thus, despite the technical NYFSA violation, ALOF is not entitled to damages. *See e.g.*, *Dunkin' Donuts, Inc.*, 581 N.Y.S.2d at 364-65; *BMW*, 1988 WL 45594 at *2.

Nor is ALOF entitled to rescission of the Franchise Agreement as a result of the disclosure violation. Just as with the registration violation, rescission on the basis of failing to disclose the prospectus in a timely fashion requires willfulness and materiality, *see Leung*, 604 N.Y.S.2d at 67 (citations omitted); *Baker Boys of Glendale*, 560 N.Y.S.2d at 467, and as was the case with the registration violation, ALOF has not proffered any evidence that Maoz's failure to disclose the offering prospectus at the September or April meetings was material to ALOF's decision to purchase the franchise months later, by which time Quinn Wallis reported receiving at least two copies of that document. (*See* Q. Wallis Aff. ¶¶ 8-10.) In the context of analogous state disclosure

statutes, courts have found rescission inappropriate where the franchisor's eventual disclosure is a minor deviation from the regulatory time limit and results in no damage. *See*, *e.g.*, *Two Men & a Truck Int'l v. Two Men & a Truck, Kalamazoo*, 949 F. Supp. 500, 506 (W.D. Mich. 1996) (delivery of the offering prospectus 7 days before entering the franchise agreement, instead of 10 days before, fulfilled the spirit of Michigan's state franchise act and, accordingly, did not entitle franchisees to rescission). Such is the case here, where ALOF received the offering prospectus with enough time to rely on its contents, and ALOF has not proffered any evidence that Maoz's failure to register the offering prospectus was material to ALOF's decision to purchase the franchise. Accordingly, the Court denies ALOF's request to rescind the franchise agreement based on the disclosure violation.

### c. Misrepresentations Regarding Initial Start-Up Costs And Earnings Statements

The third and final claim that Plaintiff makes regarding a violation of NY's franchise law is that Maoz made an untrue statement of material fact regarding initial start-up costs, and that it also made an unlawful earnings claim while representing that it had not, in fact, done so. (*See* Am. Compl. ¶¶ 35, 38(c), 38(d).) The NYFSA makes it "unlawful for any person to make any untrue statement of a material fact" in an offering prospectus or to "willfully [] omit to state" in an offering prospectus "any material fact which is required to be stated therein." N.Y. Gen. Bus. L. § 687(1). More broadly, the NYFSA also prohibits anyone from directly or indirectly "[m]ak[ing] any untrue statement of material fact" "in connection with the offer, sale, or purchase of any

franchise." [13] *Id.* at § 687(2)(b).  Furthermore, just as with statutory fraud claims under

Maryland's franchise law, reasonable reliance is an element of a fraud claim under the

NYFSA.  *See Emfore Corp*, 860 N.Y.S.2d at 14  (denying summary judgment on

franchisee's fraud claim under the NYFSA because a genuine issue of material fact

existed as to the extent and reasonableness of franchisee's reliance on franchisor's

alleged misrepresentations); *Solanki*, 2014 WL 320236 at *5 (denying summary

judgment for defendant on a fraud claim under the NYFSA because there was a genuine

dispute of material fact as to the reasonableness of the plaintiff's reliance); *Olivieri*,

687 F. Supp. at 1001 (granting summary judgment for defendant on a NYFSA fraud

claim because plaintiff admitted that he did not read the offering prospectus, so there

was no reasonable reliance). [14]

ALOF and Maoz make substantially the same misrepresentation arguments

related to New York franchise law as under Maryland law, *see supra* Part III.B.1.c, and

the outcome of this Court's evaluation of the parties' cross motions for summary

judgment with respect to this claim does not differ in any respect.  That is, for the

---

[13] The NYFSA also contains a separate anti-fraud provision in § 681, which bars "[a]ny deception, concealment, suppression, device, scheme or artifice employed by a franchisor" to obtain money from a franchisee, and "[a]ny material misrepresentation in any registered prospectus[,]" and "[t]he omission of any material fact in any registered prospectus[.]"  N.Y. Gen. Bus. L. § 681(10).  This subsection is subject to government enforcement only, not civil liability under § 691.  *See id.* § 691 (noting that a franchisor may be civilly liable for selling a franchise in violation of §§ 683, 684, 687).

[14] The cited cases make clear that misrepresentation claims under the NYFSA incorporate the reasonable reliance element of common law fraud.  *Cf. Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007) (citation omitted) (stating that, in order to prove common law fraud under New York state law, a plaintiff must show that: "(1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance").  Similarly, a number of federal courts have interpreted other states' franchise statutes to contain an implicit requirement that the franchisee demonstrate justifiable or reasonable reliance.  *See, e.g.*, *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 659 (6th Cir. 2000) (reasonable reliance is an element of misrepresentation claim under Michigan's franchise law); *Motor City Bagels*, 50 F. Supp. 2d at 489 (holding that reasonable reliance is an element of a misrepresentation claim under Indiana franchise law).

reasons described above regarding the analogous claim under the Maryland statute, there are genuine issues of material fact regarding (1) whether the initial start-up cost estimates listed in the offering prospectus were false; and (2) whether ALOF was entitled to claim reasonable reliance on those cost estimates. Accordingly, this Court will deny the parties' cross-motions for summary judgment on Count II to the extent they allege a misrepresentation claim based on the start-up cost estimates contained in the Offering Prospectus. With respect to the allegation that Maoz made an earnings claim despite representing in the Offering Prospectus that no such claim was made, this Court finds that ALOF has failed to meet its burden of presenting evidence that any statement regarding earnings was made, for the reasons stated above with respect to the Maryland law claim. Thus, the Court grants summary judgment to Defendant on ALOF's allegation that Maoz made an unlawful earnings claim in violation of New York law.

### C.    Common Law Fraud In The Inducement

Finally, apparently not content to invoke two states' substantially similar misrepresentation provisions in its quest for damages or rescission of the franchise agreement, ALOF also alleges that Maoz perpetrated common law fraud in the inducement when it made representations about start-up expenses. (Am. Compl. ¶¶ 39-49.) ALOF's common law fraud claim is based on the same purported misrepresentations as the Maryland and New York statutory fraud claims, and its motion for summary judgment regarding this claim fails for the same reasons, as explained briefly below.

1.    The Common Law Of The District Of Columbia Applies

As a threshold matter, this Court must determine which state's common law applies to ALOF's common law fraud claim. This matter is easily addressed in the instant context because the District of Columbia's choice of law rule is applicable to a diversity case in this jurisdiction, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985), and the District's choice of law rule directs this Court to determine whether a conflict exists between the law of the forum and the law of the alternative jurisdiction. *See Eli Lilly* 764 F.2d at 882 ("Under District of Columbia principles, we must first determine whether there is a conflict between the laws of the relevant jurisdictions."); *Barimany v. Urban Pace LLC*, 73 A.3d 964, 966 (D.C. 2013) (declining to move on to the second step of the analysis because "we see no conflict that requires resolution by means of [D.C.'s choice of law] analysis"). It is well established that there is no conflict between the law related to common law fraud in the District and in Maryland, and indeed

> [t]he elements of a fraud claim in both D.C. and Maryland are [] (1) a false representation regarding a material fact; (2) known to be false when made or made with reckless indifference to the truth; (3) for the purpose of deceiving or defrauding the person claiming injury; (4) that action was taken in reliance upon the misrepresentation, and the person had a right to rely upon it; and (5) that actual damage was suffered resulting from the misrepresentation.

*Kwang Dong Pharm. Co. v. Han*, 205 F. Supp. 2d 489, 494-95 (D. Md. 2002) (citing *Martens v. Chevrolet, Inc. v. Seney*, 439 A.2d 534, 537 (Md. 1982) and *Blake Constr. Co. v. C.J. Coakley Co.*, 431 A.2d 569, 577 (D.C. 1981)). Given that the law is the same, D.C. choice of law directs this Court to apply D.C. law. *See Greaves v. State Farm Ins. Co.*, 984 F. Supp. 12, 14-15 (D.D.C. 1997) ("No true conflict of laws exists

in the case at bar. Both Maryland and the District of Columbia instruct their courts to [do the same thing]. The absence of a true conflict compels the application of District of Columbia law by default." (citations omitted)); *see also Kwang Dong Pharm.*, 205 F. Supp. 2d at 494-95 (regarding choice of law on the plaintiff's claim for fraud, declining to decide whether D.C. or Maryland law applied, but noting that the law was the same).

2.    The Court's Analysis Of ALOF's Common Law Fraud Claims Is The Same As Its Statutory Misrepresentation Claims

Like the statutory claims before it, Count III of ALOF's complaint alleges that Maoz knowingly provided false estimated start-up expenses in the offering prospectus. (*See* Am. Compl. Count III, ¶ 42-49.)  This Court's analysis of the common law fraud claim results in the same conclusion as the Court's analysis of the statutory fraud claims, *to wit*:  ALOF's common law fraud claim regarding start-up costs cannot be resolved on summary judgment because there are genuine issues of material fact regarding whether the start-up cost estimates were false when made and whether ALOF was entitled to reasonably rely on those estimates.  What is more, the common law fraud presents an additional triable issue because, unlike the statutory fraud claims, common law fraud requires a plaintiff to prove the defendant's intent to defraud.  *See Kwang Dong Pharm.*, 205 F. Supp. 2d at 494-95.  This intent element can be "inferred from the totality of the circumstances, including indirect and circumstantial evidence[,]" *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) (citation omitted).  On the current record, a reasonable jury could find that Maoz intended to defraud ALOF with respect to the initial start-up cost figures – but this is not a foregone conclusion; a reasonable jury could just as soon decide that any misrepresentation was neither knowing nor intentional.  Because there are genuine

issues of material fact regarding falsity, reliance, and intent, this Court will deny both parties' motions for summary judgment on the common law start-up cost estimates claim allegation in Count III. *See Weidel*, 234 F. Supp. 2d at 8 n.4.

## IV.  CONCLUSION

At the end of the day, and for the reasons explained, the Court will **GRANT IN PART** and **DENY IN PART** both cross-motions for summary judgment.  With respect to Count I, which alleges violations of the Maryland Franchise Registration and Disclosure Law, the Court grants summary judgment for Plaintiff regarding Maoz's failure to register the offering prospectus, dismisses the untimely disclosure allegation because no private cause of action is available, grants summary judgment for Defendant on the unlawful earnings claim allegation, and denies both parties' cross-motions for summary judgment on the start-up cost estimate misrepresentation claim.  With respect to Count II, which alleges violations of the New York Franchise Sales Act, the Court grants summary judgment for Plaintiff regarding Maoz's failure to register the offering prospectus and to timely disclose that document, grants summary judgment for Defendant on the unlawful earnings claim allegation, and denies both cross-motions for summary judgment on the start-up cost estimate misrepresentation claim.  Finally, with respect to the common law fraud allegations in Count III, the Court denies both parties' cross-motions for summary judgment on the start-up cost estimates claim.  A separate order consistent with this opinion will follow.

Date:  September 30, 2014

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge